[No. 35338.   Department One.   February 9, 1961.]

FRANK GONZALES, *Respondent,* v. DONALD PETERSON *et al.,*
*Appellants.*[1]

[1]Reported in 359 P. (2d) 307.

[black redacted bars]

*Metzger, Blair & Gardner,* for appellants.

*Merges & Brain* and *Eugene D. Zelensky,* for respondent.

HUNTER, J.—This is a medical malpractice action in which the plaintiff, Frank Gonzales, seeks to recover damages from the defendant doctors, Donald Peterson and Burke Lair, resulting from their alleged negligence in the diagnosis and treatment of plaintiff's fractured left ankle. At the conclusion of the plaintiff's evidence, in a trial before a jury, each of the defendants challenged the legal sufficiency of the plaintiff's evidence and each moved for a dismissal. The motions were denied. Thereupon, the defendants rested and moved for a directed verdict in their favor. The plaintiff moved for a directed verdict on the issue of liability. The defendants' motions were denied and the plaintiff's motion was granted.

At the conclusion of the trial, which was submitted to the jury on the issue of damages only, the jury awarded the plaintiff a verdict against both defendants in the amount of $450. The defendants moved for a judgment in their favor notwithstanding the verdict, which was denied. The plaintiff moved for a new trial or in the alternative for an increase in the verdict. The court entered an order granting plantiff's motion for a new trial unless defendants agreed to an increase in the verdict to the amount of $2,523. The defendants refused to consent. An order granting a new trial, which was not limited to damages only, was entered. The defendants appeal.

The appellants contend that the controlling reason the trial court erred in granting the respondent a new trial is that the evidence was not sufficient to take this case to the jury. The rule upon which the appellants rely is stated in *Adams v. Anderson & Middleton Lbr. Co.,* 124 Wash.

356, 214 Pac. 835 (1923) (on rehearing 127 Wash. 678, 221 Pac. 993 (1924)). There we stated:

"   .   .   .   If the evidence was not sufficient to take the case to the jury, the respondent was not entitled to a new trial on the ground of the inadequacy of the damages. The rule supported by the authorities appears to be that, where there is not evidence sufficient to take a case to the jury, it is error for the trial court to grant a motion for a new trial upon the ground of the inadequacy of the damages, and that the party against whom the verdict is rendered has the right to urge this, even though he could not appeal from the denial of the motion for judgment notwithstanding the verdict. [Citing cases.]

"The evidence not being sufficient to take the case to the jury upon the question of the primary liability, it was error for the trial court to grant a new trial because of the inadequacy of the damages."

At the rehearing of the *Adams* case, *supra,* we clarified the rule by holding the appellant in that case under the circumstances was entitled to a judgment dismissing the action in its entirety.

The above rule is applicable in the instant case in the event the record discloses the evidence was insufficient to carry the respondent's case to the jury.

The evidence shows the respondent was a high school student at Buckley, Washington. While playing practice football on June 24, 1954, he sustained a fracture of two bones in his left foot, commonly known as a "Potts fracture," which is a fracture of both the medial malleolus and the lateral malleolus of the lower fibula. Several days thereafter, the respondent consulted Dr. Peterson, who reduced the fractures and applied a cast extending from the foot to the hip. On July 22, 1954, Dr. Peterson left Buckley to enter medical missionary work in Africa, at which time he turned his practice over to Dr. Lair. The medical records of Dr. Peterson, which were introduced in evidence, show an X ray was taken on July 13, 1954, and noting "position good," recommending the cast be cut down to a short leg cast on July 22, and left on for another four weeks at which time the union should be good.

Dr. Lair saw the respondent for the first time on July 22, 1954, at which time the cast was reduced to a short leg cast. An X ray was taken on August 23, 1955, and the cast was removed the latter part of August. An X ray was taken on September 8, 1954, and Dr. Lair testified it showed the healing process was satisfactory and the bones were in alignment. Respondent testified that when the cast was removed his ankle was discolored and swollen and there was a big sore over the broken ankle area; that Dr. Lair told him not to be afraid to use the ankle, and that he would be able to play basketball that fall; that the sore was healed when he saw Dr. Lair shortly after school started (September 8, 1954), but the ankle was still sore, discolored and swollen. He further testified that he played basketball during that season, and on occasions when Dr. Lair was at the games, he complained to him that he was still having trouble with the ankle and wanted to know how long it would take before it would be strong; that he was assured by Dr. Lair, on these occasions, it would take time, and he was still "babying it somewhat." Dr. Lair, on the other hand, denied attending any of the basketball games and testified the only time he came to his office after September 8, 1954, was on January 10, 1955; that the object of respondent's visit was to know whether his ankle was in condition to permit his going into the Marine Corps; that he did know the respondent had been playing basketball; and that the respondent said "it had been bothering him some." Dr. Lair also testified there was some swelling, but it was the usual amount expected, and that no X ray was taken.

Dr. Lair did not see the respondent after the office call on January 10, 1955. The respondent played basketball the remainder of that season, played some tennis and baseball that spring, and at the end of the school year, he went into the Marine Corps. About a month thereafter, July 5, 1955, he received a medical discharge by reason of a flareup of his ankle. On July 25, 1955, he was in an automobile accident which further aggravated his ankle condition, whereupon, after consultation with Dr. Kirk J. Anderson, he was

operated on to correct a condition of a nonunion of the medial malleolus, one of the previously fractured ankle bones. Dr. Anderson testified, however, that the condition of nonunion was in existence prior to the automobile accident, that the respondent made a good recovery and there was no residual disability.

It is the respondent's theory that there was never a firm union of the fractured bone in question, or that the nonunion should have, in any event, been discovered by the appellant Dr. Lair with proper diagnosis. The respondent relies on the testimony of Dr. Anderson. Part of this testimony, pertinent to this appeal, is as follows:

"A. Generally speaking, when the word non-union is used, it indicates that a state of lack of bony continuity in the form of healing at the site of a previous fracture has taken place. In other words, a given fracture may not go on to a complete bony union on the basis of several reasons, with the result that a heavy fibrous tissue connection develops between the bone ends rather than actual bone, and this we refer to as a non-union of a fracture.

" . . . I feel in this given instance a state of non-union could have been diagnosed, but probably only by x-ray. . . . And, on the basis of physical examination alone, a diagnosis of non-union cannot be established. The x-rays must be relied upon to a major extent, and x-rays under such circumstances would only be taken on the basis of complaint by the patient.

"Q. . . . did I understand you to say that x-rays would normally only be taken on the basis of complaints by the patient? A. What I meant to imply by that was the usual reason that a patient goes to a doctor wherein x-rays may be necessary to evaluate his condition is only on the basis of complaint. And I think it would only be a fair assumption that in the presence of complaints, then further examination and x-rays undoubtedly would have been taken. . . .

"Q. In your opinion, was there ever a firm, bony union in this fracture? A. If you are implying by the term 'a firm, bony union' that the fracture did not complete its normal process of repair, then I must say no. Q. There was never a firm, bony union, is that correct? A. In that sense, no. Q. It is a double negative, I have got to get this down

in the sense that you have stated, was there ever a firm, bony union? A. No. . . ."

"Q. Could you tell us how long this healing process actually continues on the average or as a general rule in a fracture such as we are concerned with here? A. It actually may go on for a period of many months and, in some fractures, this overall reparative process may extend upwards of a year. Q. Is it possible for the non-union to occur at any time during the year? A. No, it is not, it would be expected that it would occur towards the earlier periods of repair than in the later stages. . . ."

In considering the record as above related, in the light of respondent's first assignment of error, we find no evidence whatsoever of negligent care or treatment of the respondent by the appellant Dr. Peterson. An order should therefore be entered by the trial court dismissing Dr. Peterson from this action with prejudice. The appellant hereafter referred to will be Dr. Lair only.

We are further satisfied that the respondent has failed to establish there was an occurrence of a nonunion of the medial malleolus in the respondent's ankle prior to the taking of the X ray on September 8, 1954. The finding of Dr. Lair on that date that the healing process was normal, was not inconsistent with the testimony of Dr. Anderson. However, the crucial period was between September 8, 1954 and January 10, 1955, in view of the undisputed testimony of Dr. Anderson that the healing process could continue for as long as one year, but that the reversion to nonunion would have taken place in the early part of that period. The nonunion of the medial malleolus in the respondent's ankle would therefore have been in existence at the time of the respondent's examination by Dr. Lair on January 10, 1955, which was more than six and one-half months after the fracture. Since, on the basis of Dr. Anderson's testimony, the nonunion would have been disclosed by X ray, this leaves only one question remaining in the disposition of the appellant's first contention. Did the failure of Dr. Lair to take an X ray of respondent's ankle on this occasion subject him to liability for malpractice to the respondent?

■ It is well settled that before a physician or surgeon may be held liable for malpractice he must have done something in the treatment of his patient which the recognized standard of medical practice in his community forbids in such cases, or he must have neglected to do something required by that standard. *Richison v. Nunn, ante* p. 1, 340 P. (2d) 793 (1959).

■ The appellant contends no such standard of medical care, as defined in the *Richison* case, has been proved in the instant case. We agree that there is no evidence of such a standard of care in precise language; however, we believe a recognized standard of care by a physician in the diagnosis of the condition of a patient such as that of the respondent is implicit in the testimony of Dr. Anderson: ". . . I think it would only be a fair assumption that in the presence of complaints, then further *examination and x-rays undoubtedly would have been taken.*" (Italics ours.)

■ The testimony of the respondent was clear, that complaints were made to Dr. Lair that he was having difficulty with his ankle on occasions during the basketball games in the fall and winter and as late as January 10, 1955, six and one-half months after the fracture, and at that time his ankle was swollen. X rays were not taken under conditions when Dr. Anderson testified they undoubtedly would have been taken. This type of care obviously does not require the skill and learning of a specialist and it would necessarily apply to a physician or surgeon in the community of Buckley. Dr. Lair admitted that had he known the condition of a nonunion existed he would have undoubtedly referred the respondent to a specialist for further treatment. We believe the record discloses sufficient evidence for the instant case to go to the jury on the issue of negligent diagnosis and care. The appellant Dr. Lair therefore cannot prevail in his contention that the trial court erred in granting respondent's motion for a new trial on the grounds of insufficiency of the evidence.

The appellants make it clear in their brief that they do not seek a new trial and in the event they are unsuccessful

in a dismissal of the action, they assign error to the granting of a new trial on the grounds of inadequacy of the verdict, which we will now consider.

■■ The respondent argues that the verdict of $450 was inadequate since the loss of wages and medical and hospital expenses alone, resulting from the corrective operation, exceeded that amount. The appellant's negligence was not the cause of the operation. The corrective operation was necessary because of the nonunion in the respondent's foot, for which the appellant was not responsible. The appellant's negligence was his failure to discover the nonunion which resulted in delaying the operation. The only damages alleged, therefore, which can be attributable to the appellant's negligence are the pain and suffering endured by the respondent that would have otherwise been avoided had the corrective operation been performed at an earlier date. The respondent argues, however, that had the operation been timely performed, there would have been no loss of wages for the "reason that respondent did not get his job until the summer following his graduation from high school and discharge from the Marine Corps." This argument is without merit. What the respondent may have done in the summer and fall of 1955, in the event his foot had been in a different condition, is purely speculative. The verdict of $450 must therefore be attributed to an award for pain and suffering. We cannot say this award is so inadequate as to indicate it was the result of passion or prejudice in view of the record of respondent's ability to continue to participate in at least a limited capacity in his athletic activities. *Martin v. Coca Cola Bottling,* 48 Wn. (2d) 444, 294 P. (2d) 429 (1956).

The judgment granting a new trial should be reversed and the case remanded for a dismissal of the judgment against Dr. Peterson, and for reinstatement of the judgment against Dr. Lair.

MALLERY, DONWORTH, WEAVER, and OTT, JJ., concur.

---

April 4, 1961. Petition for rehearing denied.