[No. 36766.    Department One.    December 5, 1963.]

ORVILLE TEIG, *Appellant*, v. ST. JOHN'S HOSPITAL *et al.*,
*Respondents.**

*Reported in 387 P. (2d) 527.

*Miracle, Treadwell & Pruzan* and *J. B. McCoy,* for appellant.

*Atwell, Moore, Walstead & Hallowell,* for respondent St. John's Hospital.

*McLean, Klingberg, Houston & Bergman, Judson T. Klingberg,* and *Jerry A. Houston,* for respondent Axling.

POYHONEN, J.[†]—Appellant sued the respondents, St. John's Hospital and Dr. J. L. Axling, for damages alleged to have been proximately caused by concurring negligence of both in the treatment of appellant's leg fractures. Trial to a jury took 10 days. At the close of appellant's case, the trial court granted the respondent hospital's motion to dismiss and denied a similar motion of respondent Axling. Trial resulted in a jury verdict of $25,000 against respondent Axling. Thereafter the trial court granted respondent Axling's motion for judgment notwithstanding the verdict and also his alternative motion for a new trial,

" . . . said order for a new trial not to become effective unless and until the order granting the motion for judgment notwithstanding the verdict shall hereafter be reversed, vacated, or set aside in the manner provided by law . . ."

Appellant assigns as error: (1) dismissal of appellant's complaint against respondent hospital, and (2) granting of respondent Axling's motions for judgment notwithstanding the verdict and for new trial, and failure to enter judgment for appellant in the sum of $25,000.

---

[†]Judge Poyhonen is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

The appellant, Orville Teig, age 55, weight about 120 pounds, was admitted to St. John's Hospital in Longview on the evening of June 20, 1959, with two broken legs. His physician, Dr. J. L. Axling, of Longview, arrived within a few minutes. The fracture of the femur of the left leg healed without incident. The right leg had severely comminuted fractures of the upper tibia and fibula with dislodged bone fragments. Under general anesthetic a closed reduction was performed, and plaster of paris casts were applied to both legs, extending from the toes to the groin. Because of impairment to circulation in the right leg, evidenced by a cold and cyanotic condition of the toes, the right leg cast, under doctor's orders, was split full length on the inner side and later on the outer side, the two parts being thereafter held together with tape. X-rays on June 22 showed satisfactory alignment and "fragments appear to be in satisfactory position." Otherwise, appellant's hospital stay was relatively uneventful until the afternoon of June 23rd.

About 3:30 p. m. on June 23rd, appellant was exhibiting symptoms of confusion and disorientation. He imagined water dripping from the pipes holding the bedside curtains. About 8:30 p. m. that day, he was seeing "flying bugs" and was shouting. Dr. Axling, reached by phone, made a diagnosis of delirium tremens and by phone prescribed paraldehyde. Appellant quieted down and slept. At 4 a. m. June 24th, appellant awoke, was confused, and was trying to get out of bed. Paraldehyde was given with no effect. Dr. Axling, again reached by phone, at 4:45 a. m., prescribed paraldehyde, intermuscularly, and whisky, orally. At 7 a. m. a nurse noted that appellant was trying to get out of bed. At 8:55 a. m. appellant was again trying to get out of bed, and Dr. Axling, by phone, ordered morphine to be repeated in 2 hours and 1 ounce of whisky every 3 to 4 hours. Later that morning, Dr. Axling saw appellant at the hospital and left orders for whisky every 3 hours, up to 5 or 6 ounces that day and 4 ounces the next, morphine sulphate every 3 to 4 hours as needed, and B-complex vitamins.

The bed sideboards were at all times kept in a raised position. Dr. Axling did not order restraints, testifying that to restrain a patient with delirium tremens is dangerous and must be a last resort. Hospital nurses had been looking in on appellant at frequent intervals. Appellant's wife suggested a full-time attendant, but a nurse informed her that this would have to be ordered by the doctor. Dr. Axling did not order a full-time attendant because he did not think it reasonably necessary. At noon appellant was shouting, trying to get out of bed, and confused, "thought he had bought hospital and was renting out rooms," and "thought he was at work at the mill." At 1 p.m. appellant was found in his room, out of bed, on a chair. The right leg cast had fractured clear through on both sides, close to the site of the bone fracture.

The next morning, June 25th, bloody drainage was noted. X-rays that day showed misalignment and lateral angulation of the distal fragments. On June 26th, bloody drainage was noted. Dr. Axling attempted realignment of the leg and put on a new cast. At that time, blebs, or blisters, were noted. X-rays 3 days later, June 29th, show "compared to the last films, no change is noted."

The next X-rays were on August 18th, 50 days later, and the report was ". . . very little radiographic evidence of callus. The relationship of the fragments of the upper tibia and fibula can not be determined on the present films, apparently they are not penetrated enough." August 31st Dr. Axling ordered a window cut in the cast and drainage was noted. X-rays on September 8, 1959, showed "no change noted since last films."

X-rays were next taken on September 25th, and the report was "On the lateral film the distal fragments show anterior angulation in relation to the comminuted proximal fragments. On the AP film there is lateral displacement of the distal fragments." That day Dr. Axling removed the cast; there was a sharp bend in the bone at the fracture site, a forward angulation of the lower bone of 26 degrees, and no evidence of healing of bone or bony union or callus formation.

Three days later, September 28, 1959, Dr. Axling turned care of the appellant over to Dr. James W. Weed of Longview, an orthopedic surgeon, who, on that date, made an attempt to realign the leg and applied a new cast. X-rays taken the next day disclosed that the attempt at realignment had not been successful. November 20th Dr. Weed performed a bone graft. The site of the bone graft, as well as the site of the incision into the donor bone, developed a stubborn infection. The appellant was removed to a Veterans' Hospital in Vancouver, Washington, in March, 1960, where, on April 5th, he suffered a heart attack. On July 18th surgery was performed on the right leg and particles of dead bone removed, and, on July 29th, the right leg was amputated above the knee.

By pretrial order, negligence of the respondent hospital, if any, was limited to the period of June 20 to June 24, both inclusive, 1959. The appellant's argument is that appellant aggravated his injury in getting out of bed because the hospital negligently failed to take one of two necessary precautions that were available to it: (1) application of a posey belt around appellant's waist and tied underneath the bed, and (2) assignment of a full-time attendant so long as appellant's condition required.

The general standard of care required of a hospital is set forth in *Cochran v. Harrison Memorial Hospital*, 42 Wn. (2d) 264, 270, 254 P. (2d) 752, quoting with approval from *Smith v. Simpson*, 221 Mo. App. 550, 288 S.W. 69:

" 'It is not disputed that all the authorities hold that private hospitals owe to their patients such ordinary care and attention as the mental and physical condition of such patients reasonably requires. The law demands reasonable care, such care as a reasonable man would take under the circumstances existing, but no man is required to take measures against a danger which the circumstances as known to him do not suggest as likely to happen.' "

Accord, *Roth v. Havens, Inc.*, 56 Wn. (2d) 393, 353 P. (2d) 159; *Kent v. Whitaker*, 58 Wn. (2d) 569, 364 P. (2d) 556; *Benjamin v. Havens, Inc.*, 60 Wn. (2d) 196, 373 P. (2d) 109.

The undisputed evidence is that the hospital employees had complied with every direction and order of the attend-

ing physician and had kept him fully informed of appellant's condition; that the appellant was a small man with long leg casts on both legs, extending from the toes to the groin; that prior to 1 p. m. on June 24, 1959, appellant had been able only to raise his neck, head, and shoulders slightly by using his arms and elbows; that the sideboards on the bed were kept raised; and that the nurses had looked in on appellant at frequent intervals.

The attending physician had diagnosed the appellant's problem as delirium tremens and had, in the exercise of his medical judgment, declined to authorize physical restraints because he felt such would be dangerous to the patient and could result in serious injury and even death. True, the appellant's medical witness testified that, in his opinion, appellant did not have delirium tremens, but he was not there with his advice at the time. The hospital administrator and employees could not reasonably have been expected to possess superior knowledge of appellant's medical problem so that, under the circumstances, they would have been justified in defying the attending physician's orders and now be held negligent for having failed to defy them.

Dr. Axling had not directed the respondent hospital to provide a full-time attendant. He did not believe it reasonably necessary, and was amazed to learn that appellant had left his bed. His testimony:

" . . . he must have been a superman. That is the only way I can account for it. A man with a long leg cast, with the cast up to the thigh, with both sideboards up and broken legs and he gets out of bed, it is pretty amazing."

And again:

" . . . I considered it impossible for him to get out of bed with it. . . . Obviously there was an error in judgment."

The appellant's own medical witness, Dr. Foley, was of the opinion that the hospital had met the standard of care. His testimony on cross-examination, without objection, was as follows:

"Q. Doctor, from your examination of the hospital records, and particularly with reference to the Nurses' Notes,

do you feel the hospital met the standard of care in the locality? A. Yes."

We agree that there is no evidence that the standard of ordinary care and attention required of the respondent hospital was not met. The dismissal was proper.

■ In medical malpractice cases we have repeatedly held (1) that a bad result is not, in and of itself, evidence of negligence; (2) that the standard of reasonable skill, learning, and care to which a doctor is held is measured by that ordinarily possessed and applied by others in like practice in the same, or a similar, area or locality at the time; and, (3) that a doctor has, by omission or commission, failed to meet the foregoing standard must be established by medical testimony, unless the negligence is so obvious that lay persons of ordinary understanding would recognize it as such. *Fritz v. Horsfall*, 24 Wn. (2d) 14, 163 P. (2d) 148; *Derr v. Bonney*, 38 Wn. (2d) 678, 231 P. (2d) 637, 54 A. L. R. (2d) 193; *Huttner v. MacKay*, 48 Wn. (2d) 378, 293 P. (2d) 766; *Richison v. Nunn*, 57 Wn. (2d) 1, 340 P. (2d) 793; *Gonzales v. Peterson*, 57 Wn. (2d) 676, 359 P. (2d) 307.

The trial court granted both motions of respondent Axling, for judgment notwithstanding the verdict and for new trial. The reasons assigned for each overlap somewhat, so that both may properly be considered together under five headings: (1) error in the trial in permitting appellant's only medical witness, Dr. James B. Foley of Portland, Oregon, to testify to standards of medical practice and care in Longview in 1959 (applies to motion for new trial); (2) that there is no substantial evidence of respondent's negligence (applies to both motions); (3) that, in any event, there is no substantial evidence of a causal relationship between respondent Axling's negligence and appellant's ultimate loss of his right leg (applies to both motions); (4) that the verdict is so excessive as unmistakably to indicate that it must have been the result of passion and prejudice (applies to motion for new trial); and, (5) that substantial justice was not done (applies to motion for new trial).

As to (1), this is crucial, for if Dr. Foley was not qualified,

appellant's case must fall for lack of any medical testimony. This is a case in which medical testimony is necessary to establish negligence. It is undisputed that Dr. Foley is licensed in Oregon and Kansas; that he is a graduate of Creighton University School of Medicine; that he served an internship of 1 year at St. Vincent's Hospital in Portland, Oregon; that he engaged in the general practice of medicine at Roseburg, Oregon, for 3 years; that he did industrial surgery in Portland for 3 years; that he has engaged in the general practice of medicine in Portland since 1939; that he maintains his own clinic and office, is on the staff of two Portland hospitals, and sees on the average of 25 patients a day. To a direct question, Dr. Foley answered that he was familiar with the standards of general practitioners in the vicinity of Portland and Longview. It is not seriously urged that he does not know the standards in Portland. He has not, however, practiced in Longview or its immediate vicinity, and it is seriously urged that he cannot know the standards in Longview, even though he may say that he does. We take judicial notice that Longview is approximately 50 miles from Portland.

This court had occasion in *Tennant v. Barton,* 164 Wash. 279, 284, 2 P. (2d) 735, decided in 1931, to say:

" . . . The operation under consideration was performed at a hospital in Longview, in the state of Washington. The doctor called as a witness resided and practiced at Portland, in the state of Oregon, and had never practiced his profession in Longview, or in the immediate neighborhood. The objection to his testimony was that he could not know what was common or good practice in the general neighborhood in which the appellants were practicing. But the witness answered to a direct question that he was familiar with the standard of practice of medicine and surgery in the general locality of Longview, though he admitted on cross-examination that he was not familiar with the particular kinds of practice employed in the city of Longview or the neighboring city of Kelso.

"It was not made to appear, however, that the standard of practice in those cities differs in any respect from that of the general locality, say southwestern Washington and northwestern Oregon; and the court cannot assume that it does differ. . . ."

The respondent Axling has some knowledge of the standards in Portland and its vicinity. He is a graduate of University of Oregon Medical School, interned at Multnomah County Hospital in Portland, has taken refresher courses at the Oregon Medical School and attended educational meetings in Portland. He has been licensed in Oregon and could be again, on payment of the appropriate fees. He has been in general practice in Longview since 1948. Dr. Axling testified:

"Q. Generally speaking from your general practice, or your general experience, I mean, is the practice the same in Oregon as it is here? A. Yes. Q. Do you have the same facilities available in, let's say here in this county as you would in Multnomah County, from a general standpoint? A. In general. They may have some aortagraphic studies which they could do there which we don't do here. Q. Well if you went to practice, let's say in Portland, would you feel at home in the practice there in the same way you feel at home in Longview? A. Yes."

The reasonable inference to be drawn from this testimony is that Dr. Axling is acquainted with the standards of practice in Longview and in Portland and that they are essentially the same. Dr. Axling was the party defendant, and his admissions are binding on him. No citation of authority is necessary.

Respondent argues strenuously that this testimony did not relate to standards of care and practice. The answers were first elicited on pretrial deposition. There could not have been any conceivable purpose in appellant's putting these questions to Dr. Axling other than in an attempt to secure from Dr. Axling, if possible, an admission as to the similarity of the standards in the two towns and thereby qualify a Portland doctor to testify against him. The purpose was accomplished.

There is no doubt in our minds that Dr. Foley was shown to be sufficiently qualified to give the testimony he did.

In discussing (2), that there is no substantial medical evidence as to negligence, it is necessary to quote excerpts of Dr. Foley's testimony. On direct examination:

"Q. So that, Doctor, now I will ask you whether or not this, the failure to take a diagnostic X-ray from the 25th of June, 1959, until September 18, 1959, is above or below the standard of practice—on September 8, 1959—is above or below the standard of practice in this vicinity? . . . A. It is below. Q. Will you explain, please, Dr. Foley, the significance of allowing this leg to remain in this angulated condition from the 25th of June down until something was done about it in the middle of September? A. There is an angulation of a fracture which was present on the 25th of June and which had not been corrected for ten weeks, and this particular phase of this, the man had little or no chance of getting a normally functioning leg during this period. . . . Q. Will you tell us from an examination of these Nurses' Notes whether or not under the standard of practice in this vicinity a general practitioner would have been, or would have or have not been required by the indications of the notes and the patient, to enlist a specialist's assistance and consultation in the Orville Teig case, and when, if any, the physical condition required such assistance be enlisted? A. One of two things that happened, the angulation should have been either corrected by the doctor in attendance on the 25th, or else a consultation should have been called in at approximately that time. . . . Q. . . . after June 25th were there on your examination of the hospital records, any further indications subsequent to that time when a general practitioner would under the standard care in this vicinity, be required to ask for additional specialist's medical consultation and assistance? A. Yes, by the very latest film taken 6/29/59, which shows there was no change in angulation of the fracture."

And on cross-examination:

"Q. As I understand, Doctor, your testimony was that you would not do an open reduction on this right leg of Mr. Teig at the time he was brought to the hospital? A. I didn't say I wouldn't do one. I said the doctor had his choice of reductions, and that his try at a closed reduction was in order. Q. You also testified closed reductions as of that date was within the standard of care? A. Yes. Q. What time in your testimony was something else that should be done? A. It was noted on the X-ray film of 6/25 there was an angulation to the fracture, and when it was noted again on the 29th that that angulation persisted, then it was time for the doctor to do a realignment or refracture or get help. . . . Q. In other words, other doctors of equal skill and training may have determined in their best judgment that

no open reduction should be done? A. No, because on that particular date they did not have alignment of the bones and they should not have left the leg in that particular condition from June 25 until the 18th of September, or approximately ten weeks, before any attempt was made to bring these fractures again into proper alignment, and during that interval there were no diagnostic X-rays made to determine whether there was healing going on in this particular fracture."

And on redirect:

"Q. Doctor, what I would like to ask you about in connection with healing, what is the significant thing with reference to a fracture like this, when you are considering the overall problem and how long it is taking to heal the fracture? A. The significant thing about this fracture is that at no time even in a period of three months as reported by the X-ray man and the radiologist was there any sign of healing, and yet the condition was left alone."

It was one of the contentions of the respondent doctor and his medical witnesses that the appellant was virtually doomed to lose the lower part of his right leg from the outset, regardless of medical procedures followed, because either the injury of June 20th or the incident of June 24th had damaged or ruptured the nutrient artery supplying the blood to the lower part of the tibia. Dr. Foley's testimony:

"Q. Was this nutrient artery that supplied Orville Teig's leg in such an area as might be affected in any way by the original fracture or by the experience he had on the 24th of June, looking at this X-ray? A. I would say it was not disturbed. Q. . . . On what did you base the judgment it was not disturbed, knowing the hospital record and the fracture and the treatment and so on? A. The distal fragment of which we have pictures until December still show the bone is viable. Q. What do you mean by 'viable'? A. It still shows good bone formation. Q. It is alive? A. Yes. . . . Q. Incidentally, Doctor, if the nutrient artery that supplied the blood supply to the lower part of the tibia had been ruptured, let us say, or torn apart in the original accident, or in the experience that he had on the 20th or on the 24th, when he got out of bed, if the artery had been torn apart or ripped open, what would have occurred? A. First, there would have been a massive hemorrhage of fairly large arteries, and this hemorrhage

would have permeated the entire area of the fracture and the adjacent tissues to it. Q. What would a layman like one of us see on this leg? A. The entire lower leg would be black and blue."

Summarized, Dr. Foley's testimony was that, after June 24, 1959, appellant had a severely fractured right leg presenting a difficult medical problem; that the original, rather satisfactory, alignment had been lost; that realignment had not been accomplished by June 29th; that by June 25th there were blebs under the cast, "a cardinal sign of danger of infection;" that appellant's condition was left alone from June 25th for 3 months without any effort at realignment, either by closed reduction or by open reduction, if the former failed to produce results, and without diagnostic X-rays in the interim to determine whether any healing was taking place, and without a specialist being called in for help, and that, during this period of time, appellant had little or no chance of getting a normally functioning leg; that this course of general neglect, the failure to follow a number of indicated procedures, fell below the standard of practice in the locality.

Finally, it is urged that Dr. Foley's answers to two questions constituted a retraction of his other testimony and destroyed the probative value thereof. On cross-examination:

"Q. Doctor, I suppose doctors of equal skill and learning such as yourself might differ in their opinions as to whether or not they would do an open reduction on June 25th? A. Yes. Q. Is it also true, doctors of equal skill and learning might have different opinions as to whether or not to call a specialist on that day? . . . A. Yes."

The answers here are directed to one specific day, June 25th. They do not amount to a retraction of Dr. Foley's earlier testimony that these procedures were called for, by the standard of practice, on June 25th "or approximately that time" or after the X-ray report of June 29th. Dr. Foley testified repeatedly that a try at a closed reduction on June 25th was in order but, when the X-ray report on June 29th showed that the angulation still existed, the condition should not have been left alone.

As to (3), that, in any event, there is no substantial evidence that the negligence of Dr. Axling was a proximate cause of the amputation, it is necessary again to set out an excerpt of Dr. Foley's testimony:

"Q. [Following a long hypothetical question] Will you state whether or not you have an opinion as to the proximate cause of this amputation? You can answer that 'Yes,' or 'No.' . . . A. Yes. Q. What is that opinion? A. I feel that the proper protection of the patient and his fracture had not been given, at least since the 25th of June, 1959, to protect and promote healing. . . . Q. . . . Does that connect it with the course of conduct you described as having commenced on the 25th of June? A. It is a continuous condition, yes. Q. Is it your statement as an ultimate result the leg had to be amputated? A. Yes."

■ There was evidence from which a jury, if it believed, could find that by September 28, 1959, the date on which the appellant's care was turned over to Dr. Weed, the appellant had, through respondent Axling's negligence, more likely than not lost what chance he ever had of regaining a usable right leg. It follows, therefore, that the amputation was the natural and probable consequence of the respondent's negligence and the chain of circumstances remains unbroken, unless something done or not done by Dr. Weed or at the Veterans' Hospital amounts to an independent, intervening cause. There is, however, no evidence of any negligence on the part of Dr. Weed or the Veterans' Hospital.

The appellant was not required to prove his case beyond a reasonable doubt, nor by direct and positive evidence. It was necessary only that he show a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable. *Helland v. Bridenstine,* 55 Wash. 470, 104 Pac. 626; *Jordan v. Skinner,* 187 Wash. 617, 60 P. (2d) 697; *Atkins v. Clein,* 3 Wn. (2d) 168, 100 P. (2d) 1; *Helman v. Sacred Heart Hospital,* 62 Wn. (2d) 136, 381 P. (2d) 605.

■ We have not discussed the testimony of five medical witnesses called by respondent Axling, all of whom took issue with Dr. Foley. We are not concerned here with pre-

ponderance. We said recently in *Helman v. Sacred Heart Hospital, supra,* p. 145,

"If, . . . there was sufficient evidence of believable qualities arising from the direct and cross-examination of all witnesses, the courts ought not to weigh the quantum of evidence to determine if it balances on one side or the other. Weighing the evidence lies exclusively within the province of the jury. This concept has been long established in this state, . . ."

As to (4), that the verdict is so excessive that it must unmistakably have been dictated by passion and prejudice, we are not able to determine from the record that such is the case.

■ The appellant was a family man, 55 years of age, with a life expectancy of about 20 years. He had been employed for 23 years continuously in a mill by Weyerhaeuser Company, except for a period of military service, with average annual earnings for the 5-year period of 1954 to 1958, inclusive, of about $3,980. He sustained a disabling heart attack in the Veterans' Hospital, not shown to be causally related to his problems with the right leg, but it can hardly be said that he is as well off with a bad heart and one good leg as he would be with a bad heart and two good legs. Under the circumstances, we cannot say that an award of $25,000 as compensation for disability, pain, suffering, loss of wages and impairment of earning ability, is so excessive as unmistakably to indicate that the verdict must have been the result of passion and prejudice.

As to (5), that substantial justice was not done, we are not persuaded that there was a miscarriage of justice. An examination of the trial proceedings satisfies us that there was no reversible trial error.

■ As grounds for a new trial in the event the judgment notwithstanding the verdict is set aside, the respondent Axling makes two assignments of error not heretofore mentioned. The first is that the trial court erred in refusing to permit the respondent to test on voir dire Dr. Foley's knowledge and qualifications concerning standards of practice in Longview. The trial court did, however, on cross-examination permit unlimited inquiry into the doctor's

qualifications. Since it appears that Dr. Foley was qualified in any event, there is no error. Respondent has cited no authority in support of this assignment of error. The second is that the trial court erred in failing to give respondent's requested instruction "T" to the jury, withdrawing certain issues from the consideration of the jury. This assignment is not argued and cannot be considered.

The judgment of the trial court dismissing the action against the respondent, St. John's Hospital, is affirmed. Respondent hospital shall recover from the appellant its costs on appeal.

The judgment of the trial court granting the respondent Axling's motions for judgment notwithstanding the verdict and for a new trial is reversed. The cause is remanded to the trial court with directions to reinstate the jury's verdict and to enter judgment in favor of appellant and against respondent Axling in the sum of $25,000, plus costs. Appellant shall recover from respondent Axling his costs on appeal.

OTT, C. J., ROSELLINI, HUNTER, and HALE, JJ., concur.

---

January 28, 1964. Petition for rehearing denied.