[No. 37823.    En Banc.    March 28, 1968.]

JAMES L. DOUGLAS *et al., Appellants,* v. R. A.
BUSSABARGER *et al., Respondents.**

*Reported in 438 P.2d 829.

*Bernard B. Kliks* and *Comfort, Dolack & Hansler* (*Robert A. Comfort*, of counsel), for appellants.

*Stark & Wieland* and *Allan R. Billett*, for respondent Bussabarger.

*Ogden, Ogden, Roberts & Murphy* (*Frank H. Roberts, Jr.*, of counsel), for respondent Sterling Drug, Inc.

FINLEY, C. J.—This is a suit for damages for personal injuries brought against a doctor who performed an operation to repair a stomach ulcer of the plaintiff-wife, and against the drug company which supplied a portion of the anesthetic used in the operation. The plaintiff-wife will be referred to hereafter as though she were the sole plaintiff.

The results of the operation mentioned above were partly beneficial and partly disastrous to the patient. Her gastric symptoms were alleviated, but when the plaintiff recovered consciousness, her lower trunk had lost feeling or sense of touch, and she could not move her legs. The source of this disability centers around the spinal block administered to plaintiff to anesthetize her during the operation.

At the time of trial, although there had been some slight improvement in her condition, her right foot, bowels, and bladder were still in a state close to paralysis.

The jury returned a verdict in favor of both defendants, and plaintiff has appealed. We believe that plaintiff is entitled to a new trial as to defendant-Dr. Bussabarger because of certain errors which occurred at trial.

There is no substantial basis for appeal as to defendant-drug company. No question is raised regarding the correctness or purity of the substance which the company delivered to the hospital. The only question raised by plaintiff is whether the company should have labeled the drug's container so 'as to warn of possible dangers of use of the drug.

However, even if we assume such labeling should have taken place, defendant-Dr. Bussabarger testified that he relied on his own knowledge of anesthetics and, in fact, did not read the labeling which was on the container. Thus, if defendant-drug company was negligent in not labeling its container so as to warn of dangers, this negligence was not a proximate cause of plaintiff's disability. We therefore will devote the remainder of this opinion exclusively to issues relating to Dr. Bussabarger.

The author of a recent article prefaced his remarks by saying:

[A]s the following consideration of medical professional liability in Washington indicates, no single group occupies a more favorable position at law than members of the medical profession. J. Steincipher, *Survey of Medical Professional Liability in Washington*, 39 Wash. L. Rev. 704, 710 (1964).

If we were to affirm the judgment of the trial court, not only would we perpetuate the advantageous position of the medical profession, but we would exaggerate and extend it unnecessarily. Three assigned errors in particular were highly prejudicial to plaintiff's case, and unnecessarily beneficial to defendant-Bussabarger.

The first of plaintiff's three assignments of error which we will consider relates to the trial court's instruction No. 11. This instruction reads as follows:

In this case the plaintiffs claim that the defendant Bussabarger was guilty of negligence in the professional services he performed for them; you are instructed that such matters involve technical professional questions and can only be proven by physicians and surgeons trained in their profession, and in *ascertaining in this case whether the defendant Bussabarger was guilty of malpractice, you are limited exclusively to the testimony of doctors.* (Italics ours.)

■ In the absence of negligence so obvious that a layman can recognize it, *some* medical testimony is necessary to support a finding that the doctor departed from the standard of reasonable care. Often this requirement becomes a difficult, almost insurmountable obstacle for plain-

tiffs in malpractice suits when they encounter what has been termed the "conspiracy of silence."[1] But none of the cases go so far as to require that malpractice be established *exclusively* by the testimony of doctors. If the rule is to have any rational justification at all, it should be limited to the requirement that, in those cases in which negligence is not apparent, *some* medical testimony is necessary to establish the proper standard of care. *See* Note, *Malpractice and Medical Testimony*, 77 Harv. L. Rev. 333, 334-36 (1963). This would satisfy the avowed rationale of the rule in that it would prevent laymen from speculating as to what is the standard of reasonable care in a highly technical profession. But certainly it is putting a heavy burden or impediment upon the victim of medical negligence to require him to show the specific acts of negligence (as well as all the other elements of his cause of action if the trial court's words are to be taken literally) exclusively by the testimony of doctors when, frequently, as here, the only doctor who witnessed the allegedly negligent acts was the defendant.

In the instant case, defendant-Dr. Bussabarger testified that when a patient is undergoing a stomach operation, injection of spinal anesthesia above the second lumbar vertebra is not proper procedure. Plaintiff produced further expert testimony to show that if the needle insertion were too high, particularly if it hit the spinal cord, there likely would be a spasm or some immediate reaction from the patient. Plaintiff testified that she felt a sharp pain low in her back on the entry of the spinal needle, and complained of the hurt before losing consciousness. In addition, one of

---

[1] *See* J. Steincipher, *supra*, at 705; M. Belli, *An Ancient Therapy Still Applied: The Silent Medical Treatment*, 1 Vill. L. Rev. 250 (1956). Dean Prosser, commenting on "[t]he well known reluctance of doctors to testify against one another," says in a footnote: "A survey made by the Boston University Law-Medicine Research Institute, and reported in Medical Economics, Aug. 28, 1961, found that out of 214 doctors, only 31% of the specialists and 27% of the general practitioners said they would be willing to appear for the plaintiff if a surgeon, operating on a diseased kidney, removed the wrong one. In Agnew v. Parks, 1959, 172 Cal. App.2d 756, 343 P.2d 118, a suit was actually brought against a group of doctors for 'conspiracy to obstruct the ends of justice' by refusal to testify." W. Prosser, Torts § 32, at 167 n.45 (3d ed. 1964).

plaintiff's witnesses, Dr. Durkin, testified that he found some evidence of damage to her spinal cord. The trial court's instruction No. 11 did allow the jury to consider this evidence. However, it apparently was not enough, standing alone, to persuade the jury of defendant-Bussabarger's negligence.

Plaintiff attempted to provide additional evidence of negligence. Various hospital records admitted into evidence at trial showed the diagnosis of plaintiff's post-operative condition to be cord damage, which could well indicate improperly high injection of the spinal anesthetic. Other evidence was introduced by plaintiff which indicated that the amount of anesthetic injected was excessive. However, under the trial court's instruction No. 11, none of this additional evidence could be considered by the jury since it *was not the testimony of doctors.*

In our judgment, it was error for the trial court to give instruction No. 11 to the jury and thereby exclude from their consideration the additional evidence of negligence which plaintiff attempted to provide. Testimony of doctors is not the only type of evidence which may be considered by juries when deciding whether or not physicians are guilty of malpractice.

Defendant-Bussabarger cites *Teig v. St. John's Hosp.*, 63 Wn.2d 369, 387 P.2d 527 (1963), to support his contention that negligence can be shown only by the testimony of doctors. In *Teig,* a doctor testified for the plaintiff as to what would be the reasonable standard of care in that particular situation and what would constitute a violation of that standard; but nurses' notes, X-rays, and hospital records were used to show the fact of the departure from the established standard of care. This court reversed a judgment for the defendant doctor and reinstated a verdict for the plaintiff.

It seems to us that the proper approach toward any evidentiary requirement of expert testimony was expressed in *Byrom v. Eastern Dispensary & Cas. Hosp.*, 136 F.2d 278 (D.C. Cir. 1943), in which the court had before it a jury instruction possibly less objectionable than the one before

us. The instruction in *Byrom* read: " ' . . . If you find from the testimony of the experts in this case that the treatment and conduct of defendant, Dr. Young, was in keeping with good and approved practice among physicians of like qualifications and experience . . . then your verdict must be for the defendant.' " In reversing a judgment for the defendants, the court said, 136 F.2d at 279:

> We think this instruction went a little too far. It in effect told the jury to ignore all of the evidence in the case save that of the doctors who testified as experts . . . .
>
> Unquestionably only experts are qualified to express an intelligent opinion as to what constitutes the proper method of treatment of a serious bone injury. But that their evidence should be accepted in exclusion of other evidence of conditions and results is contrary to the applicable rule, both in this jurisdiction and elsewhere. As was said in Cornwell v. Sleicher, 119 Wash. 573, 205 P. 1059, 1061, the proposition that experts alone are qualified to testify as to the manner of treatment of a patient is "sound only when soundly applied," . . . .

We adopt the view indicated by the *Byrom* opinion. The jury should have been instructed that the need for expert medical testimony is limited to establishing the proper standard of care that defendant-Dr. Bussabarger should have followed. Furthermore, the jury should have been instructed to consider all the evidence in determining whether the defendant failed to meet that standard of care.

As has been observed, "Except for malpractice cases (against a doctor, dentist, etc.) there is no general rule or policy *requiring* expert testimony as to the standard of care, and this is true even in the increasingly broad area wherein expert opinion will be received." 2 F. Harper & F. James, The Law of Torts § 17.1, at 966 (1956). It has also been observed that, "[n]evertheless, the possible distinction [between malpractice actions and other tort actions] has not seemed to most courts sufficient to warrant a unique requirement of expert testimony for the purpose of providing general background facts . . . ." Note, *Malpractice and Medical Testimony*, 77 Harv. L. Rev. 333, 335 (1963). It

therefore seems clear that the type of instruction suggested above would meet the requirements and suggestions of the authorities, protect the legitimate interests of physicians and surgeons, and be much fairer to laymen-plaintiffs in malpractice actions.

Defendant-Bussabarger contends, however, that, even if it was error for the trial judge to give instruction No. 11, it was harmless error since the evidence discussed above is insufficient to establish his negligence as the cause of plaintiff's injuries. We find no merit in this contention. The doctrine of res ipsa loquitur was available to plaintiff to get her case to the jury.

■ In the recent case of *Pederson v. Dumouchel*, 72 Wn.2d 73, 81, 431 P.2d 973, 979 (1967), we described cases in which res ipsa loquitur is available as follows:

> A case in which the doctrine of res ipsa loquitur applies is a circumstantial-evidence case. In it, the jury is permitted to infer negligence from a result which ordinarily would not have been reached unless someone was negligent. The jury may make the inference of negligence or it may refuse to do so.

We believe the instant case falls within this rule. Plaintiff submitted to surgery for the purpose of having a stomach ulcer repaired. After surgery she was paralyzed from the waist down. It is clear to us that this typifies those cases in which res ipsa loquitur applies because mankind's general experience and observation teaches that the harmful result probably would not occur in the absence of someone's negligence. *See Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.*, 62 Wn.2d 351, 382 P.2d 518 (1963).

■ In *Pederson v. Dumouchel, supra,* at 81, 431 P.2d at 979, we made the following statement:

> Not to awaken from a general anesthetic for almost a month, and then with apparent brain damage is so extraordinary an occurrence within the general observations of mankind as to raise an inference of negligence.

In our judgment, paralysis after an operation to repair a stomach ulcer raises the same inference.

■ Assuming that plaintiff's disability does not fall clearly and unmistakably within the category of those res ipsa cases described above, nevertheless we believe the medical testimony in the instant case, under what we regard as the unique circumstances of medical malpractice cases, was enough *in this case* to create an inference of negligence and justify application of the principles of res ipsa loquitur.

Dr. Malden, a physician who testified for plaintiff, set forth seven possible causes of the type of condition suffered by the plaintiff after the operation by the defendant-Bussabarger. They are: (1) that the needle was introduced at the wrong place; (2) that there was a contaminant on the needle; (3) that the needle carried damaging bacteria or other organisms; (4) that the wrong substance was injected; (5) that there were contaminants in the substance injected; (6) that the correct substance was injected in the proper quantity and in the proper way, but produced an abnormal result; and (7) that the quantity of the substance injected was incorrect.

Dr. Malden effectively eliminated the second possibility, a contaminant on the needle, by saying that, "long before the needle enters the spinal canal, it has to squeeze through the skin, through the muscle, through the ligaments, and this simply, by physical action of squeezing, will cleanse the needle." He also ruled out the third possibility, that the needle carried damaging bacteria or other organisms, since no infection was introduced into plaintiff's spinal cord or subarachnoid space. This means that five of Dr. Malden's original seven possible causes survived closer scrutiny. They are: (1) that the needle was introduced at the wrong place (although he later concluded in his testimony that it was unlikely the needle hit the spinal cord since, unlike Dr. Durkin, another physician who testified in the matter, he was unable to find cord damage); (2) that the wrong substance was injected; (3) that there were contaminants in the substance injected; (4) that the quantity of the substance injected was incorrect; and (5) that the correct sub-

stance was injected in the proper quantity and in the proper way, but produced an abnormal result.

An oft-quoted statement of the doctrine of res ipsa loquitur is that of Chief Justice Erle in *Scott v. London & St. Katherine Docks Co.*, 3 H. & C. 596, 601, 159 Eng. Rep. 665, 667 (1865):

> There must be reasonable evidence of negligence.
>
> But where the thing is shewn to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care.

The usual conditions precedent to application of res ipsa loquitur are: (1) An event which ordinarily does not occur unless someone is negligent, (2) the agency or instrumentality causing the event within the exclusive control of the defendant(s), and (3) no voluntary action or contribution to the event on the part of the plaintiff. *Emerick v. Mayr*, 39 Wn.2d 23, 234 P.2d 1079 (1951); W. Prosser, Torts 218 (3d ed. 1964).

It is apparent that the first condition is not met unless all possible causes of an injury are such as would not ordinarily occur in the absence of someone's negligence. It is contended by defendant that an abnormal reaction to the anesthetic given plaintiff does not fulfill this condition. Although it may appear initially that she was not entitled to the benefits of res ipsa loquitur, it is our judgment that a different conclusion must be reached upon further examination of the nature of the particular reaction which plaintiff may have had.

Dr. Malden testified that plaintiff's abnormal reaction might have taken one of two forms: idiosyncratic or hyperergic. An idiosyncratic reaction, according to Dr. Malden, belongs in the family of allergic reactions. It differs from a normal reaction in type, rather than in degree. A hyperergic reaction, on the other hand, is evidently a term used by medical theorists to describe what can only be called an

unexpected and unexplainable reaction to an injection of the correct substance in the proper quantity and in the proper way. It differs from a normal reaction in degree, rather than in type—the opposite of an idiosyncratic reaction. Dr. Malden distinguished idiosyncratic and hyperergic reactions as follows:

> An idiosyncratic reaction is an entirely different reaction [from a hyperergic reaction], not only in quantity, but in quality. If I give an aspirin to somebody, I expect them —let's take a patient who has a temperature. I give them aspirin to lower the temperature. If I give aspirin to a normal patient, I expect the temperature to come down for four hours, and again, go up again. Now, let's take another patient. I give him a tablet of aspirin, and this patient drops dead. That is an idiosyncratic reaction. It did not affect his temperature at all, but he just dropped dead, or he had a bronchial spasm. Now, take the same aspirin; I give a normal dose to the patient, and the patient's temperature, instead of dropping down five degrees and five-tenths of a degree and staying down for four hours, drops down precipitously and stays down for three days. That is an abnormal reaction to a normal dose; but the actual quality of the response is normal. The temperature dropped and stayed down. It dropped too much, it stayed down too long. This is called hyperergy.

Dr. Malden eliminated an idiosyncratic reaction as one of the possible causes of plaintiff's disability because of subsequent tests which he ran. Presumably, however, he was unable to determine by testing whether or not plaintiff had had a hyperergic reaction because such reactions are evidently unpredictable and not subject to diagnosis except through a process of eliminating other possible causes. In other words, "hyperergy" is a term used to label abnormal reactions for which theoretically there is no explanation.

We are thus confronted with a situation in which there are four possible causes of plaintiff's disability which would be the result of negligence and one possible cause of the disability which would be the result of some indefinite and amorphic abnormality. Under the circumstances, we do not believe plaintiff should have been denied the aid of the

doctrine of res ipsa loquitur. Were we to hold otherwise, patients who suffer injury or disability while being operated upon will be unable to recover damages if the doctor merely alleges that a mysterious, unexpected, and unexplainable reaction by the patient to treatment took place on a single, isolated occasion, even though there is other medical testimony from which a jury could reasonably conclude that the doctor was in fact negligent. Such a result seems particularly unjustifiable and undesirable in light of the conclusion reached in one major study of the effects of spinal anesthetics that *if* there *is* such a thing as hyperergy (resulting in what is termed the *cauda equina* syndrome), and there is serious doubt that there is, *it may be avoided by proper medical precautions.* R. Dripps and L. Vandam, *Long-term Follow-up of Patients Who Received 10,098 Spinal Anesthetics,* 2 Foundations of Anesthesiology 888 (1965). We thus believe the instant case may be fairly said to come within the following rule set forth by Dean Prosser, W. Prosser, *supra,* at 222:

> The plaintiff is not required to eliminate with certainty all other possible causes or inferences [in order to have res ipsa loquitur apply], which would mean that he must prove a civil case beyond a reasonable doubt. All that is needed is evidence from which reasonable men can say that on the whole it is more likely that there was negligence associated with the cause of the event than that there was not.

Defendant-Bussabarger contends that even if res ipsa loquitur would otherwise apply, it is inapplicable in the instant case because the drug company was also a defendant at trial. The general rule is, as defendant-Bussabarger points out, that a plaintiff does not make out the requisite preponderant case by showing only that he has been injured by the negligence of one or the other of two defendants. W. Prosser, *supra,* at 225.

■ Because we have already determined that the drug company's negligence, if any, was not a proximate cause of plaintiff's disability, Dr. Bussabarger will be the only defendant on retrial. Assuming, however, for purposes of

argument, that evidence exists which might suggest negligence on the part of the drug company proximately causing plaintiff's disability, plaintiff may still get her case against Dr. Bussabarger to the jury. A case against one defendant which is supported by specific circumstantial evidence of negligence and which would otherwise go to the jury under the res ipsa loquitur doctrine is not prevented from doing so by the existence of evidence of negligence on the part of another defendant. *McCarty v. Hosang,* 154 F. Supp. 852 (W.D. Mo. 1957); W. Prosser, *supra,* at 255 n.70.

We thus hold that the doctrine of res ipsa loquitur was available to plaintiff to get her case to the jury.

It is important to emphasize that the effect of our decision is not to make doctors "insurers," nor to make it impossible for them to defend themselves in malpractice cases. On the contrary, the function of the doctrine of res ipsa loquitur is only to prevent a nonsuit, not to decide the case. Doctors still have an opportunity if they so choose to come forward with evidence as to exactly what did take place in the operating room and thereby seek to avoid liability.

Plaintiff's second assignment of error relates to the trial court's failure to give her requested instruction No. 13, which explains the application of the doctrine of res ipsa loquitur. The requested instruction is substantially the same as that approved by this court in *Pederson v. Dumouchel* 72 Wn.2d 73, 431 P.2d 973 (1967), and in *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.,* 62 Wn.2d 351, 382 P.2d 518 (1963).

We have in this jurisdiction two lines of cases concerning the res ipsa loquitur doctrine, one of which is represented by *Ball v. Mudge,* 64 Wn.2d 247, 391 P.2d 201 (1964), which states that res ipsa loquitur is not a rule of law but a rule of evidence and that it never requires a jury instruction, but serves only to get a plaintiff past a nonsuit. (Although the plaintiff failed to present direct evidence of causation in this case, her evidence was properly held sufficient to take her case to the jury.)

The other line of cases is exemplified by *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc., supra,* which approved an instruction on circumstantial evidence which, *inter alia,* advised the jury of its right to infer negligence when the plaintiff's evidence showed that the injury was one which ordinarily would not have occurred without negligence.

■ In the instant matter, Dr. Malden's testimony established that four of the five possible causes of plaintiff's injuries required the negligence of defendant-Bussabarger. Because of the nature of the fifth possible cause, this evidence supports the finding that the result was one which does not ordinarily occur in the absence of negligence. Therefore, since the line of cases exemplified by *Horner, supra,* is applicable, the requested instruction No. 13 should have been given.

Plaintiff's third principal assignment of error relates to instruction No. 7. This instruction reads as follows:

> You are instructed that the defendant, Dr. R. A. Bussabarger, should be held only to the standard of practice of the ordinary prudent general practitioner performing general surgery in the Raymond, Washington or a similar community during the time involved, that is, August of 1961.

■ Dr. Bussabarger conceded in his testimony that the standard of care for the operation he performed on the plaintiff would be the same for general practitioners in Olympia, Tacoma, or Seattle. Plaintiff excepted to the instruction given and proposed an instruction which would have allowed the jury to determine the standard of care based on testimony as to what it was in a broader geographical area. It would seem that the defendant-Bussabarger's admissions would be sufficient grounds to establish that it was error to allow the jury to believe he was to be held to a less stringent standard. A defendant should not be judged by a lower standard of care than he himself requests. But, apart from Dr. Bussabarger's admissions, we are convinced the instruction was erroneous because it led the jury to believe that less stringent standards should be allowed for general

practitioners in Raymond, Washington, than those allowed for physicians elsewhere in more populous areas.

Admittedly, there probably was considerable justification for the local standard rule in frontier days. Dean Prosser points out that the original rationale for this rule was that in early America a country doctor did not have the facilities, contacts, or opportunities for learning and experience afforded by large cities. W. Prosser, Torts § 32, at 166 (3d ed. 1964). But times have changed. Modern means of transportation permit country doctors to attend up-to-date medical seminars; the general circulation of medical journals makes new developments readily available to them, and they can easily and quickly communicate with the most modern and up-to-date medical centers in cities throughout the United States. As has been pointed out, today's rural practitioner can and does give and receive advice transmitted thousands of miles over the telephone, and he is expected to keep himself apprised of recent developments as they are regularly published in medical journals. F. Spies, *Arkansas Model Jury Instructions: Malpractice,* 20 Ark. L. Rev. 86 (1966).

The editorial board of the Stanford Law Review conducted a survey to determine to what extent the practice of medicine within each of the nineteen recognized specialties of the American Medical Association is similar throughout the country. Letters and questionnaires were sent to each of the American Specialty Boards, the American Medical Association and American Hospital Association, publishers of medical specialty journals, and medical specialty societies. The letters and questionnaires were written with the aid of the Stanford University School of Medicine and several practicing physicians. The conclusion reached was as follows:

On the basis of the existence of standardized requirements for certification, subscriptions to medical specialty journals, medical specialty societies, and statements from American Specialty Boards, it is concluded that the practice of medicine by certified specialists within most medical specialties is similar throughout the country. Note,

*Medical Specialties and the Locality Rule,* 14 Stan. L. Rev. 884, 887-88 (1962).

The results of this survey, although cautiously worded, confirm what was fairly obvious; *viz.* that there is no longer any basis in fact for the "locality rule."

Rural and small-town doctors should not enjoy advantages not given by the law to any other class of rural and small-town tort defendants. When patients considering operations approach doctors in Raymond, the doctors do not admit that they can be a little more careless and act with less responsibility than can doctors in Olympia, who can be a little more negligent than doctors in Tacoma, who can be a little more negligent than doctors in Seattle, who can be considerably more negligent than the doctors in New York City. Certainly, if doctors should freely indicate such discrepancies in medical practice, it would not be surprising that there would be a decrease in the number of operations in Tacoma and Olympia—and a greater decrease still in the Raymond area.

Many courts have already recognized this situation. Dean Prosser notes the following in regard to the "locality rule," W. Prosser, *supra,* at 166-67:

> The older decisions sometimes stated this as a standard of the "same locality;" but this is now quite generally recognized as too narrow. Later cases expanded it to speak of "the same or similar localities," thus including other towns of the same general type. The present tendency is to abandon any such formula, and treat the size and character of the community, in instructing the jury, as merely one factor to be taken into account in applying the general professional standard.

Dean Prosser cites cases from California, Pennsylvania, North Dakota, Iowa, Idaho, New Jersey and Florida in support of his statement. The decision in *Pederson v. Dumouchel,* 72 Wn.2d 73, 431 P.2d 973 (1967) aligns Washington with these states, and updates Washington law with regard to the realities of the contemporary medical practice.

We affirm this case as to defendant-drug company. As to defendant-Bussabarger, we remand the case for a new trial in keeping with the views expressed in this opinion.

WEAVER, HUNTER, HAMILTON, and HALE, JJ., concur.

ROSELLINI, J. (dissenting)—In my opinion, this case should never have been submitted to the jury, since there was neither medical nor non-medical evidence on which the jury could reasonably base a finding that the plaintiff's disability was caused by the negligence of either of the defendants. However, it did go to the jury and the jury returned the only reasonable verdict supported by the evidence—a verdict in favor of both defendants. In order to set that verdict aside and order a new trial, the majority has found it necessary to introduce more than one "innovation" in the law, and that without any discussion of the reasons for the existing rules of law or what it considers the justification for changing them, other than the broad assumption that medical testimony is hard to get.

It is not only the law but the evidence in this case which is being subjected to considerable revision in order to reach the desired result. In discussing the testimony of Dr. Malden, the plaintiff's neurologist and expert witness, the majority opinion effectively disposes of the doctor's testimony that an abnormal reaction to the proper drug, properly administered, was a possible cause of the plaintiff's condition. It concedes that the doctor did testify that such a reaction was a possible cause, but it fails to observe that his testimony was uncontradicted and unimpeached, and that the plaintiff acknowledges that hyperergy remains "suspect" as a possible cause. Instead, the majority resorts to a report by two Philadelphia doctors on a study made in the University of Pennsylvania Hospital of some 10,000 patients who received spinal anesthesia and did not develop cauda equina syndrome. From the fact that they found no instance of the syndrome in their study, these doctors volunteered the opinion that such syndromes must be due to negligence (if indeed they *ever occur!*).

Giving this hearsay opinion the status of evidence in the

case, even though it was not introduced therein, the majority says the jury was entitled to disregard Dr. Malden's testimony concerning the possibility of hyperergic reaction and treat the other possibilities as the only possible causes of the plaintiff's condition. Thus by this bootstrap technique does the majority render the doctrine of res ipsa loquitur applicable.

I say that not only were the opinions of Doctors Vandam and Dripps not introduced at the trial and not before the jury for its consideration, but their opinions do not represent any prevailing medical view insofar as I have been able to ascertain. Since the majority can resort to independent medical research to fortify its view that the judgment should be reversed, I believe that I can legitimately resort to the products of such research to fortify my position that the verdict of the jury and the judgment entered thereon should be sustained.

My research, as well as the evidence in this case, shows that the term "cauda equina syndrome" describes a group of symptoms or effects which are of the type suffered by the plaintiff. It is ridiculous to say that they do not exist. My research also shows that there is no agreement among doctors as to the cause, although there seems to be a general agreement that the cause is unknown. *See* my footnote 3, *infra*.

But before approaching that aspect of the matter, I would like to review the testimony of Dr. Malden in a little more detail.

The plaintiff's attorney posed to Dr. Malden a hypothetical question which embodied the plaintiff's theory of what her evidence had demonstrated at that point in the proceedings. The doctor was asked to assume that the facts contained in the hypothetical were true and to state whether he had an opinion as to the cause of the plaintiff's condition. He replied that he had. When asked to give that opinion, he answered:

> My opinion is that it must have been the effect of . . . the substance in the ampules on the spinal cord

and on the nerve roots which has resulted in findings in Mrs. Douglas' case.

In amplifying this, the doctor said:

In describing, in thinking about a patient which I faced, and in trying to decide what was the cause of her condition, I cannot look into a crystal ball. I must follow a pattern of medical thinking, which is the accepted medical procedure. In doing this I must logically follow a number of steps, and in following these steps logically, as a physician and in the course of my proper medical practice, I can arrive at a conclusion, and it is because of following these correct logical steps that I, on the basis of the hypothetical question and in relation to it, would say that medically I have to consider that this was a substance in the ampule, whether—and there is a number of further possibilities what could be—well, the substance in the ampule could have been an entirely foreign substance. The other correct medical thinking would be that the substance which was in the ampule was the correct substance, but the quantity was wrong.

. . . .

. . . Then I would have to medically think that the substance which was in the ampule was the correct substance, but was contaminated. There is one other possibility. That is, that the substance which was in the ampule was the correct substance in correct quantity, but it is still this substance that in this patient has caused the particular result.

On cross-examination, he stated rather succinctly that there were in his mind three possibilities: one, that a contaminant somehow got into the ampule or into the syringe through which it was administered; two, that the substance in the ampule was not procaine hydrochloride at all but some foreign substance; and three, that the plaintiff simply had an unusual reaction to the drug.

The majority seems to feel that the doctor did not accord much dignity to this latter possibility. However, far from discounting this latter possibility, Dr. Malden took some pains to explain the difference between idiosyncratic reaction or allergic reaction, which he had indeed eliminated as a possible cause, and abnormal reaction. He said:

An idiosyncratic reaction is an entirely different reaction, not only in quantity, but in quality. If I give an aspirin to somebody, I expect them—let's take a patient who has a temperature. I give them aspirin to lower the temperature. If I give an aspirin to a normal patient, I expect the temperature to come down for four hours, and again, go up again. Now, let's take another patient. I give him a tablet of aspirin, and this patient drops dead. That is an idiosyncratic reaction. It did not affect his temperature at all, but he just dropped dead, or he had a bronchial spasm. Now, take the same aspirin; I give a normal dose to the patient, and the patient's temperature, instead of dropping down five degrees and five-tenths of a degree and staying down for four hours, drops down precipitously and stays down for three days. That is an abnormal reaction to a normal dose; but the actual quality of the response is normal. The temperature dropped and stayed down. It dropped too much, it stayed down too long. This is called hyperergy.

Dr. Malden agreed that such a possibility was consistent with the facts, inasmuch as the plaintiff did respond to the anesthetic in the expected manner—that is, she was anesthetized while the operation was performed. Also, consistent with this theory of a possible cause is the fact that the plaintiff's symptoms are anesthetic in nature. It is as though the anesthetic never wore off completely.

At this point I would like to inject an observation of my own concerning the possible causes. It seems to me that Dr. Malden's second possibility—that the substance in the ampule was not procaine hydrochloride at all—should reasonably be discounted, inasmuch as the desired and expected results of anesthesia were obtained. It would be strange indeed if some foreign substance, say epsom salts or sugar (the substance was in the form of crystals), should anesthetize the patient and produce the very beneficial relaxation of the abdominal muscles for which procaine hydrochloride and its kindred anesthetic drugs are noted. I am inclined to believe that, had Dr. Malden given this possibility (the possibility of a foreign substance rather than an anesthetic in the ampule) the same critical consideration which he apparently gave to the possibility that the

needle was injected in the wrong place, he would have concluded that it was a highly unlikely one. And, as a matter of fact, the trial court concluded and so instructed the jury that there was no competent evidence that the drug in the ampule was not pure procaine hydrochloride; and no error has been assigned to the giving of that instruction.

If that possibility is eliminated, it leaves only two possibilities: (1) that a contaminant somehow got into the ampule or into the syringe, or (2) that the plaintiff suffered an abnormal reaction. (Dr. Malden did not think an excessive amount of anesthetic was given and there was no evidence that the amount given was excessive.) As I read the majority opinion, it has now come to the conclusion that the lay juror is capable of diagnosing the cause of a condition which develops postoperatively and that a lay judge also may engage in the diagnostic procedure. I do not know whether, under the new approach, one is disqualified proportionately to the amount of medical knowledge which he is able to obtain; but proceeding on the assumption that a little medical knowledge does not automically disqualify the diagnostician, I have taken the liberty of conducting a less-than-exhaustive but nevertheless enlightening research on the subject of neurological disorders following spinal anesthesia. It was my aim not only to ascertain how universal was the opinion of Doctors Vandam and Dripps, but also to satisfy myself that the plaintiff in this case was the victim of the well-known and much-publicized "conspiracy of silence" on the part of the medical profession, and that this was the reason she was unable to prove that her condition was caused by negligence on the part of her doctor and/or the manufacturer of the drug. (Possible negligence on the part of the hospital must be discounted, inasmuch as the hospital, which supposedly sterilized the ampules and the instruments, is not a defendant!)

I will refer further to the fruits of this research later in this dissent; here I simply wish to state that I found that medical knowledge is not passed about from doctor to doctor by word of mouth (in order to conceal it from the

layman) but is written down and published copiously.[2] The medical profession has not ignored the cauda equina syndrome, nor has it ignored the fact that other neurological conditions sometimes manifest themselves after the administering of anesthetics. On the contrary, extensive research has been done and experiments have been performed, and much has been written. Still, there is no agreement as to the *probable* causes of the syndrome, and it is true that, within the medical profession, the exact cause is *not known.*[3] Possible causes have been suggested and some have been eliminated. One of the possibilities suggested is contaminants in the ampule or in the equipment with which the anesthetic is administered. However, doubt has been expressed that such a small quantity of a contaminant could produce such widespread damage.[4]

Since Dr. Malden stated on cross-examination that, in his opinion, the manner in which Dr. Bussabarger performed the surgery and administered the spinal was within the

---

[2] See, for example, *Indexa Medica* which guides the reader to numerous periodicals in many languages.

[3] A. Faulconer, Jr. (M.D., M.S. in Anesthesiology, Head, Section of Anesthesiology, Mayo Clinic, Professor of Anesthesiology, Mayo Graduate School of Medicine, University of Minnesota, Rochester, Minn.) & T. Keys (A. B., M. A. Librarian, Mayo Clinic, Associate Professor of History of Medicine, Mayo Graduate School of Medicine, University of Minnesota, Rochester, Minn.), *II Foundations of Anesthesiology* (1965); Schwarz & Bevilacqua, *Paraplegia Following Spinal Anesthesia,* 10 Archives of Neurology, at 308 (March 1964); Keating and Luke, *Anesthetic Accidents* (2d ed. 1961).

In his book Dr. Keating says that there is no evidence that neurological reactions are due to faulty or careless technique; that, although they are rare, they occur in well-managed teaching hospitals in Great Britain, the United States, and the continent of Europe, and in the hands of competent anesthetists. On the other hand, as stated by the majority, Doctors Vandam and Dripps, who conducted a study of 10,098 spinals given at the University of Pennsylvania (reported in *2 Foundations of Anesthesiology,* at 888 (1965)) and found no instance of a neurological disorder attributable to the anesthesia, concluded from their experience that such disorders can be avoided if proper precautions are taken. Others who have written on the subject have opinions which fall between these two extremes. Thus the doctors are not in agreement as to possible causes, much less probable causes.

[4] N. Greene, *Neurological Sequelae of Spinal Anesthesia,* Anesthesiology 22: 682 (1961).

standard of care in the area, it would appear that he did not believe that the plaintiff's condition was the result of negligence on Dr. Bussabarger's part.

In light of these considerations, if I were called upon to guess whether Dr. Malden, in his own mind, had eliminated the possibility of an abnormal reaction as the cause of the plaintiff's condition, I would guess that he had not done so, but rather that he favored it as the *most probable* explanation. However, Dr. Malden was not asked to state his preference among the possibilities, although he said that he had one.

I have discussed this question of Dr. Malden's testimony first and at some length because it is crucial to the disposition which the majority makes of this case. If the possibility of an abnormal reaction is not eliminated, how can it conceivably be said that this is a proper case for the application of res ipsa loquitur? That latin expression, of course, simply means "[T]he thing speaks for itself." If the "thing" says that it could have been caused by negligence or it could have happened without negligence, it certainly does not speak "negligence."

I will not further extend this already lengthy dissent by discussing the relative merits of those recent cases which have held that a jury instruction on the "doctrine" of res ipsa loquitur was proper and *Ball v. Mudge,* 64 Wn.2d 247, 391 P.2d 201 (1964), holding that a jury instruction is not necessary. I will assume the latter case has been overruled, albeit *sub silentio.*

Nevertheless, I believe that the instruction was properly refused in this case for a number of reasons. In order to make these clear, it is necessary to state the conditions which must be shown to exist before the doctrine comes into play. First, the accident or occurrence must be of a kind which does not happen ordinarily in the absence of someone's negligence. Second, the agency or instrumentality producing the injury must be within the exclusive control of the defendant. Third, the plaintiff must not have contributed to the injury. *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.,* 62 Wn.2d 351, 382 P.2d 518 (1963).

As this court said in that case, negligence can be inferred (1) when the act causing the injury is so palpably negligent that it may be inferred as a matter of law, *i.e.*, leaving foreign objects, sponges, scissors, etc., in the body, or amputation of a wrong member; (2) when the general experience and observation of mankind teaches that the result would not be expected without negligence; and (3) when proof by experts in an esoteric field creates an inference that negligence caused the injuries.

As I have previously pointed out, the first condition can be found to be present in this case only if the testimony of Dr. Malden is mutilated. He said the cause is not known and, in the present state of medical knowledge, cannot be known. The medical publications which I have examined bear him out in this.[5]

The record is devoid of evidence that any negligence on the part of either the doctor or the defendant drug company caused the plaintiff's condition. Much less is there evidence of a "palpably negligent" act causing the injury. Likewise, it can hardly be said that the common experience and observation of mankind teaches that the result would not be expected without negligence. If such is the case, the "common experience of mankind" teaches more than years of experimentation and research have been able to teach the medical profession.

Finally, the medical evidence does not raise an inference of negligence if Dr. Malden's testimony is allowed to stand as it was given, uncontradicted and unimpeached. Only by introducing medical opinions from outside the record, which in themselves are untrustworthy because they are based on a comparatively small sample and are illogical in their assumptions, and which are not shared by other equally competent doctors, can such an inference be raised. To use such a device to supply missing evidence constitutes, in my opinion, a shocking denial of due process.

---

[5] *See* note 3, *supra. See,* also, E. Hudon, *Anesthetic Death, Infection, Thrombosis and Disease,* Ins. L. J., No. 430, at 711 (1958).

I agree with the majority that there was no evidence of negligence on the part of the defendant drug company. There was also, of course, no evidence of negligence on the part of the defendant Bussabarger. But the testimony on which they rely to establish the applicability of res ipsa loquitur, that of Dr. Malden, did not assign any greater degree of probability to one possible cause than to another. As far as Dr. Malden's testimony reveals, the injury could as well have been caused by a foreign substance in the ampule as by an overdose or improper injection by the defendant doctor, and might equally as well have been caused by hyperergy. I therefore do not believe the evidence of probable causation by the defendant Bussabarger is sufficient to render the doctrine applicable.

But assuming that, as the majority seems to reason, hyperergy can be eliminated on the ground that such a cause would deprive the plaintiff of a right of recovery against someone, but that negligence of the defendant drug company is not eliminated by the fact that there was no evidence to support it, I do not think the case cited by the majority supports its holding. It says that even though there is specific circumstantial evidence of negligence on the part of one defendant, recovery may be had against another under the doctrine of res ipsa loquitur.

Of course, in this case, there was no specific evidence of negligence of the drug company. The circumstantial evidence was the same as the circumstantial evidence against the doctor (and against hyperergy)—that is, the happening of the injury. If that evidence points to the negligence of one, it cannot at the same time speak of the negligence of the other.[6] The case cited by the majority, *McCarty v.*

---

[6]It is true that the California Supreme Court has held in *Ybarra v. Spangard,* 25 Cal. 2d 486, 154 P.2d 687 (1944), 208 P.2d 445 (Cal. Dist. Ct. App. 1949) that every person who *might* have caused the plaintiff's injury is vulnerable under the doctrine of res ipsa loquitur and must prove his innocence or pay. That case, however, has been roundly criticized. *See,* for examples, W. Seavey, *Res Ipsa Loquitur: Tabula in Naufragio,* 63 Harv. L. Rev. 643 (1950); O. C. Adamson, II, *Medical Malpractice: Misuse of Res Ipsa Loquitur,* 46 Minn. L. Rev. 1043 (1962); *The Application of Res Ipsa Loquitur in Medical Malpractice*

*Hosang*, 154 F. Supp. 852 (W.D. Mo. 1957), involved a three-car collision. The car in front of the plaintiff's car dropped a piece of luggage, causing the plaintiff to have to stop suddenly. His car was rammed from the rear by a third car. He invoked specific negligence of the driver of that automobile. The court held that this did not preclude him from invoking res ipsa loquitur against the driver of the car in front of him. In that case, there were two concurring independent causes of the accident. The plaintiff was not relying on the same circumstance to prove the negligence of each, as is being done in this case. Consequently that case is not in point and does not support the majority position.

Even the plaintiff acknowledges that the case of *Seneris v. Haas*, 45 Cal. 2d 811, 291 P.2d 915, 53 A.L.R.2d 124 (1955), on which she relies as an analogous case (and indeed it is on the facts, and supports the view of the majority in this case, although they do not see fit to cite it), goes to lengths which this court has not indicated in the past that it would go in allowing the jury to infer negligence of multiple defendants. Anticipating this court might perceive the illogic of that decision, the plaintiff makes an argument in her brief that *her evidence tended to eliminate* detergents, contaminants, and foreign materials (except alcohol) as causes of her condition, as well as bacteria, preexisting disease, fracture, and idiosyncrasy; that the trial court concluded as a matter of law that the anesthetic was "pure, undiluted, uncontaminated procaine hydrochloride"; and that therefore the jury could find the cause of the plaintiff's condition was negligence of the doctor, supposedly either in administering the injection in the wrong place or in administering too much anesthetic.

In other words, the instruction which the plaintiff contends should have been given would have advised the jury

---

*Cases,* 60 Nw. U. L. Rev. 852 (1966); W. Prosser, *Res Ipsa Loquitur in California,* 37 Cal. L. Rev. 183 (1949). Those criticisms apply equally to *Seneris v. Haas,* 45 Cal. 2d 811, 291 P.2d 915, 53 A.L.R.2d 124 (1955), relied upon by the appellant, which also applied the doctrine in a case like this.

that it could infer negligence of the doctor *only* if it found that the plaintiff's condition was not caused by negligence of the drug company or by some factor for which the doctor would not be responsible. And even in this contention, the plaintiff has not suggested that she presented evidence eliminating hyperergy as a causative factor. In developing her argument that the doctrine of res ipsa loquitur is applicable, she simply suggests that the jury could reject that possibility. The majority has gone further and eliminated this possibility itself, relieving the jury of the burden.

There is, of course, no suggestion that the plaintiff's negligence caused her condition. This freedom from contributory fault is the only condition of res ipsa loquitur which is present here, but it is evidently this one fact which is directing the outcome of the case.[7] That is to say, sympathy for the plaintiff has caused the court to abandon the rules of law which are calculated to produce a result that accords with accepted concepts of justice. Ordinarily, we hold to the theory that, because one person has been injured, another should not have to pay for that loss unless he is responsible. And, ordinarily, we say the burden is on the plaintiff to prove that it was the defendant's act which produced the harm. The rationale of res ipsa loquitur is that the defendant is in a better position to explain how the accident happened and should be required to do so *because* the *probabilities* are that his negligence did in fact cause the injury. It is not the mere fact that he is in a better position to get at the evidence. That may be true in many cases in which it is not contended that the doctrine of res ipsa has any application.

It has been suggested that, in medical malpractice cases, the plaintiff is not at such a great disadvantage as he once was, since he has at his disposal discovery procedures

---

[7]And yet the makeup of the plaintiff's body or preexisting physical condition may well be a contributing factor in her disease, according to the record in this case. *See also* the sources cited in note 3, *supra*.

which will enable him to ascertain the pertinent facts.[8] In any event, the mere fact that the defendant has greater access to the facts[9] does not in itself raise an implication of negligence. It does not do so logically, any more than it does legally, in my view. This case illustrates that point. The plaintiff developed a syndrome that has been known to occur even though the anesthetic is administered under the most careful procedures; and which, in spite of earnest efforts to ascertain its cause so that it can be avoided if possible and its treatment can be better effected (this is the type of consideration which inspires medical research ordinarily, not the avoidance of lawsuits), continues to mystify those in the best position to understand it.

Not content to cast the burden of proving the cause of the injury on the defendants[10] (in spite of the fact that the plaintiff's own evidence established that this is an

---

[8]*The Application of Res Ipsa Loquitur in Medical Malpractice Cases,* note 6, *supra.*

[9]But, for example, does the doctor have greater access to knowledge of the plaintiff's previous physical condition? This may be and often is a factor in these postoperative diseases. *A. Marinacci, Neurological Aspects of Complications of Spinal Anesthesia with Medicolegal Implications,* Bulletin of the Los Angeles Neurological Society, 25:170 (1960).

Dr. Marinacci says that there is only one way to be certain that a postoperative complication is attributable to the anesthesia, and that is to perform electromyogram tests (not to be confused with myelogram). The plaintiff was not given these tests, as far as the record reveals, but her neurologist satisfied himself that her syndrome was attributable to the anesthesia.

Dr. Marinacci also reports that of 542 patients given electromyograms, counterfeit symptom-complexes appeared in a ratio of 100 to 1. I am not suggesting that there is any possibility that this was the case here, but it is of interest in indicating how ill founded a supposition may be that, because a condition followed the administering of anesthesia, it is attributable to the anesthesia—and even (if res ipsa loquitur is to be used so indiscriminately) to negligence of the doctor or someone involved in the administering of the anesthesia. And it also demonstrates rather vividly, it seems to me, that an assumption that the doctor has access to all the *facts* is not warranted. *See,* also, note 7, *supra.*

[10]Only by proving the actual cause can either definitively prove freedom from negligence, on remand of *Ybarra v. Spangard, supra,* none of the defendants was able to establish the actual cause of the plaintiff's injury and *all* were held liable.

occurrence which may very well result without negligence), the majority has also decided that the jury should be allowed to speculate on the cause of the injury. Medical science does not know the cause but perhaps the jury can filch it from the non-medical testimony.

The instruction given by the court that malpractice of the doctor must be proven by medical testimony was proper under the rulings of this court. In *Teig v. St. John's Hosp.*, 63 Wn.2d 369, 387 P.2d 527 (1963) and *Richison v. Nunn*, 57 Wn.2d 1, 340 P.2d 793 (1959), we said that negligence of a doctor by reason of his departure from the recognized standard of practice must be established by medical testimony, unless his negligence is so apparent that even a layman would have no difficulty in recognizing it. Other cases so holding are *Woods v. Pommerening*, 44 Wn.2d 867, 271 P.2d 705, 45 A.L.R.2d 1267 (1954); *Cochran v. Harrison Memorial Hosp.*, 42 Wn.2d 264, 254 P.2d 752 (1953); and *Fritz v. Horsfall*, 24 Wn.2d 14, 163 P.2d 148 (1945). The requirement in cases such as this, that negligence of the physician must be shown by medical testimony, is supported by the overwhelming weight of authority. See annotation, 81 A.L.R.2d 597. Since this was not a case in which the negligence of the defendant was so apparent that a layman would recognize it, the trial court, in my opinion, properly gave the instruction that the negligence of the defendant doctor must be established by medical testimony.

This is obviously so because the ordinary layman does not know and has no way of knowing what acceptable medical procedures are. This is an area for experts and of course they must be medical experts.

The evidence which the majority feels that the jury had a right to consider was all medical evidence. It was *all* testimony of doctors or evidence furnished by them—the fact that, for a stomach operation, insertion of the needle above the second lumbar vertebra is not considered proper procedure; the fact that, if the needle struck the spinal cord, there would be an immediate reaction from the patient; the fact that the plaintiff's condition was diagnosed

as cauda equina syndrome and paraplegia, and the amount of anesthetic injected (testified to by Dr. Bussabarger and shown on his records introduced in evidence). I think the majority is not really concerned that the jury was not permitted to consider non-medical evidence; but obviously the concern of the majority is that the jury may have felt inhibited by the instruction if it was inclined to arrive at its own diagnosis of the *cause* of the syndrome.

While there is some discussion of standard of care in the majority's disposition of the question whether a jury verdict must rest on medical testimony in a malpractice case when the negligence, if any, is not of a type which even a layman would recognize, it is apparent that it is primarily the question of causation which it feels should be submitted to the jury, whether or not there has been medical testimony tending to establish the probable cause. There was, of course, in this case, no testimony of probabilities but only testimony as to possibilities. This court has consistently held that, in a case of this kind where the layman is not in a position to diagnose the cause of a given condition, there must be expert testimony to establish the cause; and the testimony must be at least that the act relied upon *probably* caused the condition, rather than it *possibly* caused it.

In a recent opinion written by Weaver, J., *Glazer v. Adams*, 64 Wn.2d 144, 147-48, 391 P.2d 195 (1965), I find this exposition:

In *Bland v. King Cy.*, 55 Wn. (2d) 902, 905, 342 P. (2d) 599 (1959), this court said:

"The test to be applied in considering the sufficiency of the evidence to establish cause of death was announced by this court in *Seattle-Tacoma Shipbuilding Co. v. Department of Labor & Industries*, 26 Wn. (2d) 233, 241, 173 P. (2d) 786 (1946), as follows:

" 'The general rule, from which this court has never deviated, is stated in 135 A. L. R. 517, as follows:'

" ' "It appears to be well settled that medical testimony as to the possibility of a causal relation between a given accident or injury and the subsequent death or impaired physical or mental condition of the person injured is not sufficient, standing alone, to establish such relation. By

testimony as to possibility is meant testimony in which the witness asserts that the accident or injury 'might have,' 'may have,' or 'could have' caused, or 'possibly did' cause the subsequent physical condition or death or that a given physical condition (or death) 'might have,' 'may have,' or 'could have' resulted or 'possibly did' result from a previous accident or injury—testimony, that is, which is confined to words indicating the possibility or chance of the existence of the causal relation in question and does not include words indicating the probability or likelihood of its existence."

" 'In *Anton v. Chicago, M. & St. P. R. Co.*, 92 Wash. 305, 159 Pac. 115, this court expressed its views with respect to such evidence, in the following language:

" ' "Taking the opinion of the witness [a medical man] for the appellant, as quoted above, at its full worth, we think it is no more than a statement of a possibility or possibly a probability, more or less remote, that the tuberculosis is a result of the injury. This is not enough. The law demands that verdicts rest upon testimony and not upon conjecture and speculation. There must be some proofs connecting the consequence with the cause relied upon. The testimony, whether direct or circumstantial, must reasonably exclude every hypothesis other than the one relied on." ' "

In *Orcutt v. Spokane Cy.*, 58 Wn. (2d) 846, 364 P. (2d) 1102 (1961), we pointed out that the

". . . medical testimony must at least be that the injury 'probably' or 'more likely than not' caused the subsequent condition, rather than that the accident or injury 'might have,' 'could have,' or 'possibly did' cause the subsequent condition. . . ."

A corollary of this rule is the equally well-established rule (which would ordinarily control the disposition of this case) that a verdict cannot be founded on mere theory or speculation, and if there is nothing more tangible to proceed upon than two or more conjectural theories, under one or more of which the defendant would be liable, and under one or more of which there would be no liability upon him, the jury will not be allowed to resort to speculation to determine the facts. *Schmidt v. Pioneer United Dairies*, 60 Wn.2d 271, 373 P.2d 764 (1962); *Mason v. Turner*, 48 Wn.2d

145, 291 P.2d 1023 (1956); *Arnold v. Sanstol,* 43 Wn.2d 94, 260 P.2d 327 (1953). There must be evidence which would at least support a finding that there is a greater probability that the injury occurred in such a way as to fasten liability upon the person charged therewith, than there is that it happened in a way for which the person charged would not be liable. *Kilmer v. Bean,* 48 Wn.2d 848, 296 P.2d 992 (1956); *Mason v. Turner, supra.*

Those rules will apparently apply henceforth in all cases except medical malpractice cases. In medical malpractice cases, again because of the "conspiracy of silence" I take it, medical testimony of causation is not necessary, and the jury may put together two and two, or three and four, or however many bits of evidence it can add up in a given case, and arrive at the cause of a condition or disease—and this in the face of uncontradicted medical testimony that the cause, in the present state of medical knowledge, cannot be ascertained. In doing so, it may choose among possibilities, under one or more of which the defendant is not responsible for the plaintiff's injury.

The facts of this case as they are presented in the record demonstrate the absurdity of such a rule. As I have indicated earlier, Dr. Malden, the plaintiff's neurologist and expert witness, testified that he considered the possibility that the plaintiff's condition was caused by insertion of the needle at a point between T-12 and L-1 in drawing (1), which is borrowed from the case of *Seneris v. Haas,* 45 Cal. 2d 811, 291 P.2d 915 (1955), (see appendix) rather than between L-3 and L-4, the normal and customary place for the injection where the surgery is to be performed on the abdomen, and that it penetrated the spinal cord. (There would be no harm in injecting between T-12 and L-1 if the spinal cord was not struck, but it is not done unless an unusually high level of anesthesia is required because of the danger of injuring the cord and because no useful purpose is served by an injection higher than is needed for the particular surgery.)

He stated, however, that he had definitely ruled out that possibility for a number of reasons. The first was that the

nerve roots which were involved in the plaintiff's difficulties (her difficulties were with her lower abdomen and her legs and feet) were located in the third and fourth lumbar vertebrae level. If the needle had been inserted at a higher level, he said, one would expect nerve roots at a higher level to be affected. That is to say, she would have been paralyzed or anesthetized at a higher level of her body. The anesthetic would not be expected to bypass certain nerves on its way down the subarachnoid space and only affect those below L-3 and L-4.

Dr. Malden also found no evidence of *needle* damage to the spinal cord. (This does not mean necessarily that he found no *damage* to the cord, but simply he found no evidence of needle trauma.)[11]

Another reason which Dr. Malden gave for ruling out needle trauma as a probable cause of the plaintiff's disease was that, when the spinal cord is damaged, there is never any improvement, whereas the plaintiff's condition had improved somewhat which indicated that only nerve roots were involved. I could not ascertain from the doctor's testimony on this point whether he meant that there is never improvement where there is puncture damage, or that there is never improvement if there is any kind of damage.

Dr. Malden also stated that the fact that, when the needle was inserted, spinal fluid was withdrawn and was mixed with the procaine crystals to form a solution used for the injection of the anesthetic, indicated very strongly that the needle was injected in the proper place (the subarachnoid chamber—see drawing (2)) and not in the spinal cord. This makes infinite sense to me. It would seem, would it not, that, if the needle were injected in the cord and the attempt was made to draw out some fluid in the customary

---

[11]Cord damage is sometimes found in these cases and is caused by the anesthetic or other substance which is injected, according to Dr. Marinacci. See his article cited in note 9, *supra:* Drs. Schwarz and Bevilacqua (note 3) say that there is cord damage in *most* human cases. These doctors seem to feel that the secret of the cause may be found (at some future date) through study of the vascular changes which occur under the effects of the anesthesia. They do not seem much impressed with the idea of puncture wounds as a probable cause.

way, what the doctor would get in the syringe would be gray matter which is what the cord is made-up of, rather than spinal fluid which can only be found outside the cord.

Also, Dr. Malden found no external evidence that an injection had been made at a point higher than L-3. He found some marks between L-3 and L-4 which could be attributed to an injection at that place.

In sum, Dr. Malden stated that he considered it "highly unlikely" that the plaintiff's condition was caused by the injection of the needle in a improper place. Now what evidence is there in opposition to this?

Dr. Durkin, who examined the plaintiff, concluded from her reflexes and symptoms that she had suffered some cord damage as well as damage to the nerve roots. He was not asked by the plaintiff's attorney to give his opinion of a possible cause of it, and an attempt on the part of defense counsel to elicit such an opinion was thwarted by the objection that it was beyond the scope of the direct examination, an objection which was sustained by the court. I note that the majority does not suggest that the testimony of Dr. Durkin would support an inference that the needle was injected in the wrong place. And indeed such an inference would be contrary to the evidence. Dr. Malden, who ruled out needle trauma as a possible cause of the plaintiff's condition, stated that there was a possibility of cord injury. The injury, of course, could just as well be caused by the anesthetic or other substance injected, just as the injury to the nerve roots is caused by it. The anesthetic moves about in the subarachnoid space after it is injected and it is not surprising that it comes in contact with the spinal cord.

The majority has set forth the evidence which it believes is adequate to support a finding that the needle was injected between T-12 and L-1. It is as follows:

> In the instant case, defendant-Dr. Bussabarger testified that when a patient is undergoing a stomach operation, injection of spinal anesthesia above the second lumbar vertebra is not proper procedure. Plaintiff produced further expert testimony to show that if the needle insertion were too high, particularly if it hit the spinal cord, there

likely would be a spasm or some immediate reaction from the patient. Plaintiff testified that she felt a sharp pain low in her back on the entry of the spinal needle, and complained of the hurt before losing consciousness. In addition, one of plaintiff's witnesses, Dr. Durkin, testified that he found some evidence of damage to her spinal cord. . . .

. . . Various hospital records admitted into evidence at trial showed the diagnosis of plaintiff's post-operative condition to be cord damage, which could well indicate improperly high injection of the spinal anesthetic.

It can certainly be conceded for purposes of this case that injection of the needle above the second lumbar vertebra would involve an unnecessary risk. The question is, was the needle so injected. The majority says that such an injection would cause "some immediate reaction," and that the plaintiff testified she felt a sharp pain low in her back on the entry of the spinal needle. Now, to say the least, it escapes my perception how this proves anything but that the needle was inserted exactly where Dr. Bussabarger said he inserted it (*low* on the back between L-3 and L-4, not in the *middle* of the back between T-12 and L-1). There was certainly no evidence that the patient feels no pain if the needle is inserted in the proper place. The evidence was to the contrary.[12] There was also no testimony or other evidence that pain in the low back on insertion of the needle *means* that the needle has been inserted in the *wrong* place.

What is there left on which the jury is to base a finding that needle trauma or injection of the anesthetic into the

---

[12]There was medical testimony that the needle causes pain on injection and also produces sharp pain if it touches a nerve root. The normal sensations of injection are described in Wasmuth, *Anesthesia and the Law*, (1961) at 57. The author says:

Inasmuch as many people have an intense fear of spinal puncture, it is not surprising that the number of malpractice cases with this procedure is increasing. A patient does not relish the pain caused by the piercing of the skin of his back, or the snapping sensation as the longitudinal ligament is pierced, or the sudden twinge of pain if the nerve filaments are touched by the spinal needle.

spinal cord[13] caused the plaintiff's condition? She was diagnosed at one time as having cauda equina syndrome and paraplegia. The plaintiff's symptoms are certainly those of the cauda equina syndrome. There is no question about that. It is conceded on all sides. It produces varying degrees of paraplegia (paralysis of trunk and lower extremities). But what does this prove about its cause? Precisely nothing. That is what this lawsuit is about—what *caused* the plaintiff's cauda equina syndrome. The record says that no one knows, but most probably it was *not* negligence in injecting the needle in the wrong place. It may have been contaminants in the syringe or in the anesthetic; and it may well have been simply the anesthetic itself producing, in the plaintiff's particular body, an effect which is rarely produced by the anesthetic but which is *sometimes* produced and the mechanism of which is not understood by medical science. It may be the effect of the anesthetic on the blood vessels in the anesthetized area (*see* note 11, *supra*).

It may possibly be that the *concentration* of the drug caused it, even though the concentration used was within what are ordinarily considered safe limits. Here again, the majority would permit the jury to speculate on whether *too much* anesthetic was given. There is not one scintilla of evidence that too much anesthetic was given. The evidence was that the amount varies according to the weight of the patient, the length of time required by the operation, the degree of muscle relaxation required, and the way the patient's body responds to the drug.[14]

---

[13]Keating (*see* note 3, *supra*) says that cord puncture and injection of solution probably would produce *immediate collapse*. "[I]f the patient survives long enough," evidence of transverse myelitis might be observed.

[14]The following authority confirms the medical testimony on this:

"Some patients require much more intra-spinal procaine to produce analgesia than others. There is no set dose of ether for a given case, but it is given under control as needed and the dose varies greatly. The same is true in operating under spinal anesthesia. The dose should be given as needed and under control.

"Spinal anesthesia is the choice for so many operative procedures

My research reveals that the total amount of anesthetic given is not considered to be a factor, but the total amount given at any one injection. As common knowledge would affirm, I think, the effects of an anesthetic do wear off. Now the continuous spinal anesthetic, which Dr. Bussabarger chose to use in the plaintiff's case, is recommended for use with the old and the very young *because* smaller amounts are given at one time than would be given in a single injection and thus it is easier on the patient.[15]

So it would appear that Dr. Bussabarger chose a method of anesthesia that is considered advantageous for the most vulnerable patients. He administered, in all, 700 milligrams of procaine over a period of approximately 3 hours and 5 minutes. There was no evidence that this was an excessive amount or that it was administered in an excessively concentrated solution. For aught that appears in the record, if the doctor had used less anesthetic the patient would not have remained anesthetized throughout the operation and then we would have had a different lawsuit before us.

The only evidence, relied upon by the plaintiff to show that the anesthetic was administered in an excessive amount, is a brochure which accompanied the anesthetic and gave a recommended dosage of 150 to 200 milligrams (300 only in rare instances). In answer to an interrogatory of the plaintiff, the defendant drug company said that this recommended dosage was for single injections and not for continuous spinal. This accords with what I have been able to learn from medical treatises on the subject.[16] The largest

---

and the results are not as satisfactory when it has to be supplemented by other anesthetic agents." *II Foundations of Anesthesiology,* at 886, note 3, *supra.*

[15]"The [continuous spinal] method is very useful when either the scope or the duration of the operation is uncertain. It enables minimal dosage to be given without fear of inadequate analgesia, and so is desirable in the aged, the very young and the physically handicapped." J. A. Lee & R. S. Atkinson, *A Synopsis of Anesthesia* (5th ed. 1964), at 341.

[16]*See, A Synopsis of Anesthesia,* note 15, *supra;* J. Lundy, *Clinical Anesthesia* (1942).

single injection given to the plaintiff was the initial injection of 200 milligrams.

The majority does not state what evidence the jury was entitled to believe if it chose to decide that the plaintiff's condition was attributable to the amount of anesthetic administered to her; and this is understandable inasmuch as the record is devoid of any evidence that would support such a finding.

The plaintiff, in evaluating Dr. Malden's testimony that hyperergy remains suspect as a cause of her condition, states that he made the *false* assumption that the anesthetic was within normal limits. She neglects to mention that he made the assumption only because he was asked to do so by the plaintiff's counsel, who formulated the hypothetical question posed to him. I consider it fair to assume that the facts which the doctor was asked to assume were facts which the plaintiff felt her evidence had established at that point. It is certainly true that no evidence was presented, before or after the hypothetical question was posed, which would support a finding that the amount of anesthetic was outside the normal limits.

Thus, in removing the requirement that a finding of malpractice be based on medical testimony in a case such as this, the majority not only permits the jury to speculate, it invites the jury to do so; it even implies that the jury will be remiss in its duty if it does not do so.

In my opinion, the refusal of the plaintiff's requested instruction on standard of care was not reversible error. There was no evidence that the standard of care in Raymond was any lower than the standard of care in Tacoma and Olympia, and in fact the testimony of the defendant doctor himself was that the standard would be the same. I fail to see how the jury, if it followed the instruction and listened to the evidence and gave the words used their ordinary meaning (It is the general rule that the jury is presumed to do these things. *Strandberg v. Northern Pac. Ry.*, 59 Wn.2d 259, 367 P.2d 137 (1961); *Allen v. B. F. Goodrich Co.*, 67 Wn.2d 587, 408 P.2d 900 (1965)), could

have failed to consider the evidence of Tacoma and Olympia practices. But more significant than this is the fact that there was no evidence that the defendant deviated from any standard of care, save in one respect. The only evidence of a practice anywhere which is different from that followed by the defendant was evidence that procaine ampules are autoclaved in Olympia, rather than sterilized in alcohol as they were at that time in the hospital where the operation was performed, and evidence that autoclaving is considered a safer means of sterilization generally. This accords with my reading on the subject, incidentally.[17]

A contaminant in the drug was listed as a possible cause of the plaintiff's condition by Dr. Malden. However, again he did not name it as a probable cause, nor did any other witness, nor was there any evidence from which the jury could infer that there was a crack in an ampule used by the doctor (sterilized by the hospital, I would assume, but again for purposes of argument I am conceding his responsibility for the sterilization method). My reading on the subject of contaminants as a possible cause of neurological changes reveals that they may produce such changes; but the changes are likely to take the form of decomposition of the cells or inflammation of the arachnoid membrane rather than atrophy of the cauda equina, which autopsy has shown to be the effect upon the nerves where that syndrome is present.[18]

In any case, there was no medical testimony that alcohol probably produced the damage, and the majority does not suggest that there was "non-medical" evidence upon which the jury could reasonably base a finding that it was negli-

---

[17]Greene, note 4, *supra*. The danger is that the sterilizing solution may seep through an undetected crack in the ampule and contaminate the anesthetic. But Dr. Greene says that large quantities of alcohol would have to be injected to produce neurological changes in man. On animals experimented with, smaller quantities (but more than the amount that would probably seep through a crack in the ampule) produced such changes.

[18]Greene, note 4, *supra*; Marinacci, note 9, *supra*; Marino & Pyrdek, *Spinal Anesthesia and the Law of Professional Liability*, 3 Ill. Continuing Legal Education, No. 4 (Oct. 1965) at 79.

gence in the sterilizing of the ampules which led to the plaintiff's injury.

Evidence was not offered that, in Raymond, it is good practice to insert the anesthetic needle between T-12 and L-1 when performing abdominal surgery nor to give an excessive amount of anesthetic. The evidence was to the contrary. So, assuming the majority is correct—that the jury was entitled to find that one of these two acts was performed by the defendant doctor and produced the injury—the jury would presumably have found the act to be negligent, even though it followed the instruction given and was denied the benefit of the requested instruction.

In short, I do not see how the giving of the requested instruction and the withholding of the instruction given would have or could have affected the outcome of the case, assuming that the jury based its verdict on the evidence presented to it; and I am required to assume this if the jury system is to be given credence. There was simply no evidence of a standard of care in Raymond different from the standard of care generally in regard to those practices, one of which the majority feels the jury was entitled to find was the cause of the injury.

Of course, if my analysis of the record and my concept of the law is correct—that is, if there was no testimony tending to establish a probable cause of the injury, and if there must be testimony as to probable cause if the subject matter is not one which is readily within the grasp of the lay juror without the aid of experts—then any error in giving instructions on the standard of care was clearly harmless. If the *cause* of the condition is not established, then the standard of care is entirely immaterial. It does not matter whether the doctor's procedure was negligent if that negligence did not cause the plaintiff's injuries. That should be axiomatic. An error which does not materially affect the merits of the controversy is not prejudicial and does not require reversal. *Reid Co. v. M-B Contracting Co.*, 46 Wn.2d 784, 285 P.2d 121 (1955).

The new rule laid down in *Pederson v. Dumouchel*, 72 Wn.2d 73, 431 P.2d 973 (1967), pertaining to the standard

of care in medical malpractice cases is a good one, I think, and should be applied in all proper cases. But I do not think it should be treated like a new toy to be brought out and admired and used at every opportunity, regardless of whether the evidence in the case warrants its use or whether its application will affect the outcome.

This court has now singled out a class to be dealt with rather harshly. It is the class of those involved in the healing arts. The court says doctor, beware. It is not your duty simply to do the best you can for the sick and the injured. It is your duty, in the eyes of the courts, to see to it that the patient does not develop adverse side effects of the procedures which you use or react in an unexpected manner to your treatment. Failing in this, you will have to compensate the patient if you cannot explain how you managed to fail in these endeavors while still exercising a very high standard of care.

In the case of *Hall v. United States,* 136 F. Supp. 187, 199 (1955), the plaintiff wife developed a cauda equina syndrome, following the administration of a spinal anesthetic, just as the plaintiff did in this case. The case was tried to the court without a jury, which found that the condition could have resulted from any one of four causes, one of which was idiosyncrasy or natural sensitivity to the drug. The court felt that this was the most probable cause. In dismissing the action, the judge made a comment which is appropriate here. He said:

Any person of normal sensibilities must be deeply concerned over a tragedy such as that disclosed by this record and must feel the utmost sympathy for Mrs. Hall. Yet, however remarkable the advances made by medical science, there remains much to be learned; and members of the medical profession cannot be held responsible for circumstances beyond their knowledge and ability as human beings to anticipate and prevent. Accordingly, the law wisely requires of them only that they possess and use the reasonable knowledge, ability and skill of their colleagues.

See also *Ayers v. Parry,* 192 F.2d 181 (1951) and 53 A.L.R.2d 158.

I only trust that this court's new zeal to see that the injured patient is compensated, regardless of whether the defendant was at fault, will not be extended to the field of the law with the result that it will become legal malpractice not to win the client's case. This case illustrates how difficult it may sometimes be for a lawyer to advise his client about the probable outcome of a case if he relies on precedent and not on intuition. However, I can imagine less harm to humanity in the long run if the lawyer decides not to try the case because of the risk of losing, than if the doctor decides not to perform the operation or not to advise the use of the proper anesthetic because of the fear of a lawsuit which he may well be helpless to defend.[19]

In my opinion, the court would be doing less of a disservice to the public and the medical profession (not to mention the coherency of the common law) if it simply held that, henceforth, those who administer to the sick will be liable for conditions of the patient which develop during the operation or treatment or which come to light immediately thereafter, regardless of whether those conditions are attributable to any act of the defendant. But since this would clearly be an act of legislation on the part of the court (it is not simply a "development" (!) in the common law), it would perhaps be better, while we are about it, to extend the liability to those considered most advantageously situated to spread the loss—that is, the hospitals,

---

[19]Wasmuth, in *Anesthesia & the Law* (note 12, *supra*) speaking of *Seneris v. Haas, supra,* says, at 56:

"The effect of this decision and others, which practically hold the physician strictly liable for untoward results, upon the practice of anesthesiology in the State of California, has been profound. The use of spinal analgesia in general surgery since the California case has declined progressively, whereas it has increased in other sections of the country.

".  .  .  .

"It is a sad commentary on the courts' misunderstanding of scientific facts, when a physician feels that he must deny the patient the advantages of a particular type of anesthesia because of the possibility of his involvement in a malpractice suit."

*See also* Marino & Pyrdek, note 18, *supra.* Dr. Greene (note 4, *supra*) also expresses regret that the courts have stigmatized spinal anesthesia with the doctrine of res ipsa loquitur.

the doctors, and the manufacturers. Nurses, being salaried employees, are not in such a good position to pass the loss on to other patients and likely should be spared the bankruptcy which one would probably have to undergo after one massive judgment was taken against her. And while we are unblushingly legislating, it would perhaps be well to require that all these prospective defendants carry insurance and that insurance companies provide the insurance; and perhaps it would also be well to limit the amount of recovery for each type of condition or disability. I say this because, in the field of workmen's compensation, which is analogous and in which the legislature has seen fit to act (RCW 51), there are numerous controls and restrictions provided in order to render the imposition of liability without fault less onerous to the employer and to prevent inequalities in compensation which would probably be the rule if each injured workman were allowed to go to the jury on the question of damages alone.

However, I do not base my dissent on a concern that doctors will fail to exercise their best judgment in treating their patients because of a fear of lawsuits. For one thing, I do not imagine that the majority of doctors are so easily deterred from doing their duty. But more important, my primary concern is in the area of my own duty. It is the effect of this decision upon the law which troubles me—the emasculation of rules which have been tested by time and experience and found to promote the effecting of justice among litigants and have been properly relied upon by members of the bench and bar. It is true that there are many laymen who laugh at the law as enunciated by judges and regard it as ponderous and impractical. But I had thought that that evaluation of the judicial function was not shared by my fellows on the bench. I had supposed that, on the contrary, they had a high regard for the methods of judicial reasoning which, in addition to imposing a duty to employ logic and the perceptions derived from common experience, require that the evidence not be disregarded and that legal precedents be respected and not be departed from in the absence of compelling reasons to con-

clude that they are based on false assumptions. I find no such compelling reasons in the case before us. On the contrary, it seems to me that those rules are just as serviceable here as they have been in the past in arriving at a just result.

The formulation of public policy is primarily a function for the legislature. It has at hand the means of investigation to assure itself of the pertinent facts, it is responsive to the will of the people, and it has the means to effectuate that policy when it is formulated. This does not mean that the court should never be influenced by public policy considerations; but when a supposed public policy and the well-founded principles of justice upon which the common law is built are in direct conflict, it seems to me that the change in the law should be made by the legislature.

This court is simply not equipped to impose absolute liability in a form which maintains some semblance of justice for the party who is made the insurer. A glance at the workmen's compensation statutes, which I have referred to, shows how many factors there are to consider if a satisfactory system of "shifting the loss" is to be achieved. The legislature even finds it advisable to set up a board to administer this insurance program and thus spare both the injured workman and the employer unnecessary expenses, delays, inconveniences, and embarrassment of litigation. Certainly, it seems to me if the doctor is to be made the insurer of his patients, he should be provided protection from lawsuits in which his competency and integrity are publicly questioned and he is given the onus of malpractice, even though he has done all that he knew to do and all that medical science, in its present state of development, has told him that he could do.

This court has recently effected a change in the common law which I consider a wise one and one which is within the natural evolution of the common law. It has recognized that a factual assumption upon which an exception to the general rule of negligence was formerly engrafted by the courts is now ill founded. I refer, of course, to the case of

*Pederson v. Dumouchel,* 72 Wn.2d 73, 431 P.2d 973 (1967), holding that a plaintiff in a malpractice case will no longer be required to show that the defendant doctor departed from the standard of care in the area in which he practices, but may show that he failed to exercise reasonable care under the circumstances and thus may show what the practice is in the profession generally. This, it seems obvious to me, is a *return* to a basic principle of common law and is only a departure from a court-made exception to the principle, just as the rule of charitable immunity was such a departure.[20]

Now that a plaintiff may freely go outside his area to find his experts there should be a relaxing of the fear that he will be met with a "conspiracy of silence," inasmuch as a "foreign" expert will not need to fear local reprisal. I am of the opinion that this court should at least allow the effects of this new rule to be observed and see if it is not sufficiently efficacious to lighten the plaintiff's burden before it initiates other "reforms" of much more questionable validity.

Furthermore, I do not think that a plaintiff's attorney need be unduly handicapped by lack of information in testing the expertise of a medical witness. Medical knowledge has been written down and is accessible to the lawyer. If he confronts the witness with this knowledge, I rather doubt that the doctor would allow his reluctance to incriminate a colleague to overcome his concern for his own reputation as a man competent in his field and so profess ignorance of matters which reasonable competence would require him to know.

As far as the plaintiff's being a victim of a conspiracy of silence in this case is concerned, I find no evidence of it in the record. On the contrary, her expert witness testified quite openly and freely for her, naming every possibility of negligence which has occurred to any student of this dis-

---

[20]*See, Friend v. Cove Methodist Church,* 65 Wn.2d 174, 396 P.2d 546 (1964), wherein we recognized that the assumptions on which the rule of charitable immunity were based are now known to be invalid.

ease, as far as I have been able to ascertain. I see no reason to suppose that he refused to testify that one possible cause was a more probable cause than another for any reason other than the reason that he could not honestly do so. This is, I am convinced, a condition which sometimes develops after anesthesia (and it follows other forms of anesthesia —not just spinal anesthesia[21]) and for which medical science has not yet found a satisfactory explanation, but the causes and mechanism of which dedicated medical men are earnestly endeavoring to ascertain. It seems reasonable to conclude, however, at this point, that the anesthetic itself, acting upon the patient's body in some apparently freakish manner, is the agent which produces the damage, since the nerve roots involved are those normally affected by the anesthetic and the effect upon them is anesthetic in nature.

The plaintiff has made and argued a number of assignments of error which are not mentioned in the opinion of the majority. I assume, therefore, that the majority finds them to be without merit as I do and gives its tacit approval to the repetition of the rulings on a new trial. It might be advisable, however, I should think, to at least give some indication that the court has not overlooked these assignments. This might forestall any chance of their being raised and argued if this case is again appealed by the plaintiff, in which case it is not inconceivable that they might be made the basis for the ordering of another new trial if the court's determination that the plaintiff shall recover damages has not abated by that time.

I suppose it is anticlimactic to state that I would affirm the judgment entered on the verdict of the jury in this case and save my legal reforms to be effectuated when a more patent miscarriage of justice is presented for our review.

---

[21]*See* Greene, note 4, *supra.*

APPENDIX

(1)

Spinal cord

T12

L1

L2

L3

L4

L5

S1

S2

T12

Conus medullaris

L1

L2

L3

L4

L5

Dura

KEY:   T—thoracic vertebra
L—lumbar vertebra
C—medullaris—conus medullaris :

(2)

CROSS SECTION OF VERTEBRAL COLUMN

KEY: SS — Subarachnoid space. The spinal
     nerve roots are in this space.
     SC — Spinal cord.
     DM — Dura Mater.
     V  — Vertebra.

HILL, J. (special concurrence in Judge Rosellini's dissent)—While not concurring in all that Judge Rosellini says in his dissent, I do concur in his conclusions that this was not a proper case for the application of res ipsa loquitur, and that the probable cause of the plaintiff's pitiable condition was left to conjecture and speculation with no more than a possibility that Dr. Bussabarger's negligence, if any, may have been the cause thereof. I, too, would affirm the judgment entered on the verdict of the jury in this case.

———

July 9, 1968. Petition for rehearing denied.